FRANK WRIGHT, RESPONDENT, v. MAYER S. AS-
CHEIM, AND ANOTHER, APPELLANTS.

MALICIOUS PROSECUTION OF CIVIL ACTION—PROBABLE CAUSE.—Where
the evidence showed that appellants had obtained an injunctional
order restraining a mining company from issuing, and respondent
from receiving certain stock in a mining company, whose property
had been developed by appellants under a certain partnership
which appellants claimed to extend to the mining enterprise and
respondent to only a "lagging" contract, and the evidence showed
that appellants had knowledge of facts which tended to show
the partnership in the mining enterprise, and that appellants had
submitted their cause to a responsible attorney, who had care-
fully examined the cause and advised the bringing of, and did
bring, a suit against said mining company, and obtained the in-
junctional order; held, that the respondent had not proven a
want of probable cause and the denial of motion for new trial
was error.
ID.—ID.—WHEN QUESTION OF LAW.—Where, in a suit for malicious
prosecution of civil action, all the undisputed facts known to the
defendant, taken together, would justify in a reasonable person
the honest belief that the fact charged was probably true, the
question of probable cause is wholly a question of law and a
jury has no right under the pretence of saying that the defend-
ant did not believe the facts, to find against him.

APPEAL from a judgment of the district court of the
third district and from an order refusing a new trial.

This cause was tried before the court and a jury and a
verdict given for the plaintiff. Upon motion for new trial,
the verdict was set aside and a new trial granted, which
ruling was affirmed on appeal, 4 Utah, 455. The cause
was then tried a second time before the court and a jury
and another verdict found for the defendant. Thereupon
a motion for new trial was overruled, and the cause came
to this court on appeal. The evidence was practically the
same on both trials. No question was made in the briefs.
The remaining facts are found in the opinion.

Messrs. Bennett, Kirkpatrick & Bradley and Mr. J.
G. Sutherland, for appellants.

Mr. Frank Hoffman, for respondent.

HENDERSON, J.:

The plaintiff brought his action in the third district court against the defendant and Mocks, for malicious prosecution in instituting and prosecuting a civil action. The complaint alleges that on the 21st day of February, 1881, the plaintiff was the owner of 10,031 shares of the capital stock of the Rebellion Silver Mining Company; that the stock was not then issued, but was ready to be issued, and was placed to the credit of plaintiff, and that he was entitled to then receive it; that the defendants, Ascheim and Mocks, on that day, by an action commenced in the third district court, wherein said Ascheim and Mocks were plaintiffs, and the plaintiff herein, and Charles A. Matson, David Avery, the said Rebellion Silver Mining Company, William W. Woods, its president, and John Sholdebrand, its secretary, were defendants, and by filing a complaint in said cause, duly verified by said Ascheim and Mocks, and filing an undertaking in said action, procured a restraining order to be issued from said court, by means of which the said company, its president and secretary, were restrained from issuing, and the plaintiff from receiving, said stock; that said restraining order was incorporated with an order to show cause on March 1, 1881, why an injunction should not issue pending the said action, in terms the same as the restraining order; that the hearing of the order to show cause was from time to time postponed by the court; and that finally, on April 24, 1882, on motion of the defendants in said action, and upon a hearing, the said restraining order was dissolved; and that afterwards, upon like motion, the cause was dismissed. The complaint further alleges damages on account of depreciation of the stock while it was held under the restraining order. Service was had on defendant Ascheim, and he answered, traversing the complaint. Mocks was never served, and did not appear, and the case proceeded against Ascheim alone. The cause was brought to trial before a jury. A verdict was rendered in favor of the plaintiff for $7,000. Judgment was rendered accordingly. The defendant moved for a new trial on the ground that the evidence was insufficient to support the verdict in this, that it did not show

or prove want of probable cause or malice, but, on the con-
trary, did show probable cause for prosecuting the action,
and that, therefore, the verdict was against the law, and
for errors committed by the court in instructing the jury
at the request of plaintiff.

The motion for a new trial was denied, and the cause
comes to us on appeal from the judgment and order deny-
ing the motion for a new trial, on the two questions before
stated. The first question—the insufficiency of the evi-
dence to support the verdict—involves an examination of
the evidence. The plaintiff first put in evidence the pro-
ceedings in the cause, the bringing of which is the sub-
ject of this action. The complaint contains so full and
circumstantial a statement of facts, most of which were
not disproved or controverted, that we cannot give a better
or more definite statement of the situation of the parties,
and the matters concerning which the action was brought,
than to give it in full. After entitling in the court and
cause, it is as follows:

"The plaintiffs complain of the defendants, and allege
and show to the court that they, the plaintiffs, are
citizens of the United States of America. That, as the
plaintiffs are informed and believe, the defendant the Re-
bellion Mining Company is a corporation organized un-
der the laws of the territory of Utah, and the defendant
William W. Woods is the president, and the defendant
John Sholdebrand is the secretary, of said corporation.
And the plaintiffs further allege, the plaintiff James M.
Mocks, on his knowledge, and the plaintiff Mayer S. As-
cheim, on his information and belief, as follows: That on
or about the 5th day of August, A. D. 1880, the defendant
Frank Wright posted a notice of the location of a mining
claim on a claim called by him in said notice the 'Rebel-
lion,' situated in the Uintah mining district, county of
Summit, territory of Utah. That no ledge or lode of
rock in place, bearing silver or any metal, was discovered
by said Wright before or at the time of posting said no-
tice, but said Wright posted said notice at a place where,
according to the conformation of the country, and the
course of the ledges known to exist in said district, it was

thought probable there was a blind lode beneath the surface, which might be discovered by development work. That said notice, when posted, bore the name of defendant Frank Wright as the sole locator thereof. That soon after posting said notice of location, and prior to the 13th day of August, 1880, the defendant Charles A. Mattson, at the request of the defendant Frank Wright, commenced work on said Rebellion claim. That on or about the 13th day of August, 1880, the plaintiff James A. Mocks and the defendants David Avery and Frank Wright entered into a contract by which they became partners and jointly interested in filling a contract for supplying lagging to the plaintiff Mayer S. Ascheim, for the Ontario mine, said contract having been made between said Avery and said Ascheim; and by said partnership agreement it was stipulated by and between said defendants Avery and Wright, and the plaintiff Mocks, that each should contribute his time and labor, and his share of all expenses, in filling said contract for supplying lagging, including all expenses incurred for supplies, or otherwise, on and after the 6th day of August, 1880; and that each should share equally in the proceeds and profits derived from said business. And at the same time it was further mutually agreed by and between said defendants Wright and Avery and the plaintiff James M. Mocks that the defendants Avery and Wright and the plaintiff James M. Mocks should jointly, and as such partners, work and develop the said Rebellion mining claim, and each have an equal interest therein, and in any lodes and mineral veins discovered therein. That neither the plaintiff James M. Mocks nor the defendants Avery and Wright had any money or means to use in the development of said claim, other than his personal services and earnings, and the proceeds of their labor in filling said contract for the supply of lagging, and it was agreed between them that they should continue said lagging contract, and devote the proceeds derived therefrom, and from any earnings they might otherwise make, to work and develop the Rebellion claim. That the defendant Charles A. Mattson had full notice and knowledge of said partnership agreement, and of the relation of the

plaintiff James M. Mocks and the defendants Wright and Avery towards each other in respect to said mining claim. That, in pursuance of said agreement of partnership, the plaintiff James M. Mocks, and the defendants Avery and Wright contributed the proceeds received from the plaintiff Ascheim under said contract to furnish lagging, and the plaintiff James M. Mocks contributed all his labor and the proceeds of such labor to development of said mining claim, and furnished materials and supplies for working the same, and board and pay for other men who were hired to work and worked thereon. That by the joint contribution of the plaintiff Mocks and the defendants Avery and Wright the said Charles A. Mattson was continually kept at work on said mining claim, and one Oscar Rydvall and one Frank Molen were employed to work and worked thereon for several months, and were boarded while at work on said claim, the said Mocks working part of the time on the lagging contract and part of the time on said mining claim. That after said 15th day of August, 1880, the plaintiff James M. Mocks and the defendants Avery and Wright and Mattson, and the men employed to work said mine, all camped and messed together, part being at work on said mining claim, and others working in filling said lagging contract as aforesaid, and in doing other work; and said camp was furnished and supplied by said Mocks, Wright and Avery under their said agreement. That the plaintiff James M. Mocks, in addition to his contributions as aforesaid, personally worked on said mining claim not less than 25 days. That the plaintiff Mocks, with said Avery and Wright, by their joint labor and expense, earned in filling said lagging contract a large amount of money, all the net proceeds of which was applied to subsist the parties at work on said contract and on said mine, and to pay for labor hired on said mine, and in the development of said mining claim; and the plaintiff Mocks contributed under said agreement at least his equal share of the labor and expense with said Wright and Avery; and that the labor of said Charles A. Mattson, if by reason thereof he became entitled to any interest in said mining claim, would not entitle him to

over one-fourth, and the value of his labor did not exceed one-fourth of the expenses in developing said claim. That by joint contributions of the plaintiff James M. Mocks and said defendants Avery and Wright, under the aforesaid partnership agreement between them, a tunnel was run into said Rebellion mining claim, beneath the surface; and, at a distance of about 60 feet from the mouth of said tunnel, a lode of rock bearing silver and lead was disclosed in said claim in the fore part of September, 1880, being the first discovery of a lode therein. That after said lode was reached, and about the middle of September, 1880, the said mining claim was for the first time staked, and the boundaries thereof marked on the ground. That by said joint contributions the said tunnel was further extended on said lode a distance of about 220 feet, making in all a distance of about 280 feet. That the value of the work in running said tunnel is about the sum of $1,700. That by said joint contributions a shaft in the tunnel was sunk on the vein a depth of 16 feet, of the worth of $4 per foot. That, by said development work, bodies of ore are disclosed showing the mining claim is of considerable, and probably of great value. That on or about the first day of October, 1880, the defendant Charles A. Mattson, without the consent of the plaintiff James M. Mocks, caused his name to be put on the location notice of said mining claim, under that of the defendant Frank Wright, and afterwards, on or about the 11th day of October, 1880, the defendant Frank Wright caused a location notice to be recorded in the office of the recorder of said Uintah mining district, and by said notice, as recorded, the said Wright and Charles A. Mattson appear as the locators of said mining claim; and said recorded notice states the claim was located October 4, 1880. That after large bodies of ore were disclosed in said mining claim, and after all or nearly all the development work hereinbefore named had been done, the defendants Wright and Mattson denied that the plaintiff James M. Mocks had any interest in said claim, and proposed to pay him wages at five dollars per day, which he declined to receive. That afterwards, and on or about the last day of December,

1880, the defendants Mattson and Wright conveyed to said defendant Avery 400 feet, undivided, of said mining claim, and since said time these defendants have declined to recognize the interest of the plaintiff James M. Mocks, or to convey to him his or any interest. That on about the 27th day of January, 1881, a corporation was formed, called the "Rebellion Mining Company," with a capital stock of $20,000,000, divided into 200,000 shares of the denomination of $100 per share. That in full payment of said capital stock various mining claims were conveyed to said corporation by the corporators. That among the corporators and subscribers to said stock were the defendants Frank Wright, David Avery, and Charles A. Mattson, who conveyed to said corporation the said Rebellion mining claim, and they, or some of them, also conveyed to said corporation the Hecla mining claim, and the Ætna mining claim, and subscribed for and agreed to receive, and it was agreed in the agreement of the incorporation that they should receive, 109,400 shares of said capital stock, in full payment for said claims conveyed by them. That said Hecla and Ætna mining claims were of no value except as surface ground, and the said Rebellion mining claim constituted the whole substantial consideration for said 109,400 shares of stock to be issued to them. That the amount of stock subscribed for and to be issued to said three defendants is as follows: To the said Frank Wright, 40,123⅓ shares; to the said David Avery, 29,153⅓ shares; and to the said Charles A. Mattson, 40,123⅓ shares. And on information and belief the plaintiffs allege that certificates of said stock have not been issued by said company, and that most of the corporators, at and before the time of the incorporation of said company, and said conveyance of said Rebellion mining claim, had knowledge of the facts herein stated in regard to the development and discovery of said lode, and the contributions of plaintiff James M. Mocks thereto and his interest therein, and of all the material facts hereinbefore stated relating to his rights and interests in said mining claim. And the plaintiffs allege that the plaintiff James M. Mocks has conveyed to the plaintiff Mayer S. Ascheim an undivided half of his interest in said Rebel-

lion mining claim, and assigned to said Ascheim an undivided half of all his rights therein, and of any and all causes of action for the recovery of his interest and the avails of said interest in stock, damages, or otherwise. That the Rebellion mining claim consists of surface ground, 1,500 feet long and 200 feet wide, and the Rebellion lode therein contained. And the plaintiffs further allege that the defendants Frank Wright, David Avery, and Charles A. Mattson are insolvent, and have no property out of which a judgment for damages could be collected. The plaintiffs therefore pray judgment as follows: That the rights and interests of plaintiffs in said Rebellion mining claim may be adjudged, and that it may be determined they are entitled to an undivided one-fourth of said claim; and that a conveyance thereof from the Rebellion Mining Company to the plaintiffs be adjudged. That if in the judgment of the court such conveyance cannot be decreed, or would be inequitable, that the plaintffs be adjudged entitled to one-fourth of 109,400 shares of the capital stock of said Rebellion Mining Company, subscribed for by said Wright, Avery and Mattson, and said company be decreed to issue the same to plaintiffs. That the defendants the Rebellion Mining Company, and the said William W. Woods, its president, and John Sholdebrand, its secretary, and all officers and agents thereof, be restrained by the order of this court from issuing, and the defendants Frank Wright, David Avery and Charles A. Mattson be in like manner restrained from receiving, pending the action, one-fourth part of 109,400 shares of the said capital stock of the Rebellion Mining Company, being 27,350 shares of said stock: and that, upon trial, said injunction be made perpetual."

This complaint was verified by Mocks and Ascheim, and the injunctional order was issued upon filing it, restraining the company from issuing 10,031 shares of the stock subscribed by Wright, 10,031 of the shares subscribed by Mattson, and 7,288 of the shares subscribed by Avery, and they were each enjoined from receiving these amounts of stock, respectively. The principal testimony on the trial in behalf of plaintiff was given by Avery and the plaintiff. Their

testimony did not dispute the facts set forth in the complaint last above quoted, except as to the statement that the contract of partnership between Avery, Wright and Mocks included the development of the mining claim, and that they were to share therein. They both testified that the partnership related to the lagging, but that Mocks had no interest in the mine; that Mocks worked for some time in the mine after they quit the lagging; and that such work was done under a contract to work at five dollars per day in case ore was found; and that he was to have nothing if no ore was discovered; and that he quit in view of the poor prospect of any discovery, Their testimony tended to show that the lagging was got out near the place where the mine was being developed, a considerable distance from Ascheim's store and place of business; that Ascheim was not intimately acquainted with the relations existing between the other parties named, but that he did know that Wright, Avery and Mocks were partners in the lagging contract, and that the goods furnished by him on that contract were used in developing the mine; that but one camp was maintained in both enterprises. They both testified that they each contributed something to the development of the mine, aside from what the lagging account furnished, Avery testifying that he "believed he contributed about $30, and Wright that he furnished, he thought, about $500, but there was no evidence tending to show that Ascheim knew this, except such as might be inferred from the allegations in his complaint. Their testimony tended to show that they all three, Wright, Avery and Mocks, worked at getting out and delivering the lagging; that 7,000 were delivered; that they received from Ascheim goods on an account run in the name of Avery—he being the contractor with Ascheim—to the full value of all the lagging furnished, and about $400 besides; that it went into the maintenance of the camp and the development of the mine, except that Mocks had about $22 in clothing; and Avery further testified as follows: Mocks, after quitting the lagging business, worked about two weeks in the mine, I think. The bill run at Ascheim's was in my name, and we turned the lagging so far as

delivered. This man, Mocks, took sick, and I drew some-
where between fifty and one hundred dollars to send him
away. I forget just how much. He was not working on
the lagging, but was working for Wright. I never kept
any separate account of the lagging business. Rydvall
worked in the mine while Mocks was there, and after he
quit the lagging business; and he may have worked some
before Mocks quit the lagging. I think he made a car or
a wooden truck. Whoever did work in the mine boarded
with us at the same camp, and we drew the supplies
from Mr. Ascheim. If I recollect right, I had a little
remnant of my own money that I put in and bought a
blacksmith outfit for the mine. We got our candles,
powder and fuse either at Ascheim's or Lawrence and
Shield's. We, of course, got anything·we wanted on this
same account. I did not draw anywhere else but at Mr.
Ascheim's. I had no interest in the mine at this time,
and I let the account for mining supplies run from the fact
that when I commenced I told Wright I did not expect to
make any money out of the contract. Mr. Wright was a
friend of mine, and I felt like I wanted to assist him if
I could. I never made any settlement with Mocks on
the lagging contract. There never was any separate ac-
count made between the lagging business and the mine
to see whether there were any profits or not, and the lag-
ging went into the general account for the mine and camp.
. ·. . I put in some of my private money to assist them
in getting along with the prospect—if I recollect right,
about thirty dollars. I had drawn much more on the lag-
ging contract for the mine. I don't know where Mocks was
standing in all this matter, or what he was getting. We
was supposed to make some kind of settlement, I sup-
pose." And further, respecting the deed· to himself of an
interest in the mine, he testified: "Mattson says, 'It was
through you we got our supplies;' and he says, 'I feel as
if I wanted to give you something;' and Wright says the
same; and they each gave me 200 feet. It was through
the grub I was able to get. I never had any understand-
ing until I got the deed. Mattson had told me for a week or

two before that he would give me something, but he never said what."

The plaintiff's testimony was to the same effect. It will be seen from this statement that the question in controversy in that case was whether an agreement existed between the parties to develop the mine in partnership; that is, whether the partnership existing between Wright, Avery and Mocks extended to developing the mine, or was only in relation to the lagging. If the partnership did extend to developing the mine, then Mocks was entitled to his share, and the suit brought by him and Ascheim was properly brought. That was the question to be litigated, and if Ascheim had probable cause to believe that such was the fact when he commenced the action, then the plaintiff could not recover. The record is very voluminous, but the foregoing is substantially all of the testimony on the part of the plaintiff, showing the situation so far as known by defendant when the cause was commenced. The question of probable cause is to be determined as of the time when the action was commenced, and not what the facts may afterwards turn out to be, no matter what subsequent developments may have demonstrated, nor what the actual facts are, but what the defendant had reason to believe they were. Cooley, Torts, 183; *Stewart* v. *Sonneborn*, 98 U. S., 187; *Faris* v. *Starke*, 3 B. Mon. 4; *Fagnan* v. *Knox*, 66 N. Y., 525; *Bacon* v. *Towne*, 4 Cal., 217; *Galloway* v. *Burr*, 32 Mich., 333. Evidence of what the actual fact is or was may be proper, for the purpose of showing what the defendant did know or might have known, but such testimony should be carefully distinguished from evidence of what the defendant knew or might have known at the time the suit was commenced. Court and jury, in determining the question of probable cause, should as nearly as possible imagine themselves in the situation of the defendant at that time, and, judging from what he knew then, or upon reasonable inquiry might have known, determine whether he had such ground as would lead a man of ordinary prudence and discretion to believe the fact alleged. If he did, that would amount to probable cause, and, while it involves the proof of a negative pro-

position, the burden is on the plaintiff to show a want of probable cause: Cooley, Torts, 184; *Levy* v. *Brannan*, 39 Cal., 485; *Cloon* v. *Gerry*, 13 Gray, 201; *Bacon* v. *Towne, supra.* The determination of the question of probable cause, or the want of it, involves a mixed question of law and fact. As to what particular facts in each case will constitute probable cause is a question of law for the court, with which the jury should have nothing to do. But when the facts are in dispute, then as to what facts are established by the testimony is exclusively for the jury. But when the facts are admitted or established by verdict or otherwise, or as shown by the undisputed testimony of the plaintiff, the question as to whether they constitute probable cause or not is purely a question of law: *Stewart* v. *Sonneborn* and *Cloon* v. *Gerry*, *supra; Fulton* v. *Onesti*, 66 Cal., 575; *Eastin* v. *Bank*, 66 Cal., 123; *Grant* v. *Moore*, 29 Cal., 644; *Harkrader* v. *Moore*, 44 Cal., 145; Cooley, Torts, 181, 182; *Bulkelcy* v. *Smith*, 2 Duer, 261; *Jones* v. *Jones*, 71 Cal., 89; *Allen* v. *Codman*, 139 Mass., 136. If the defendant in this kind of an action, at the time of commencing the suit complained of, had knowledge of facts tending to show probable cause, but had knowledge of other facts which would tend to explain or modify them, or tending directly to show want of probable cause, and it becomes a question as to which of such facts were believed and acted upon, this would be a question for the jury. This is mentioned in *Stewart* v. *Sonneborn*, *supra*, as an apparent exception to the general rule that what facts will constitute probable cause is a question of law for the court; but this does not apply to a case where all the undisputed facts known to the defendant, taken together, would justify in a reasonable person the honest belief that the fact charged was probably true. In such case the defense would be absolute as matter of law, and the jury would have no right, under the pretense of saying the defendant did not believe, to find against him. If it were otherwise, the rule that what facts constitute probable cause in an action for malicious prosecution is a question of law for the court would have no meaning or force whatever. The jury might in every case,

no matter what the facts might be, under the pretense of
unbelief on the part of defendant, find against him. As
said by the supreme court of Vermont in *Barron* v.
*Mason*, 31 Vt., 189, speaking of the proof of probable
cause and malice in this class of actions: "Probable cause
has reference to the common standard of human judgment
and conduct, and malice regards the mind and judgment of
the defendant." Belief is not always the controlling ques-
tion, as is well shown by Justice Holmes, speaking for
the court in *Allen* v. *Codman, supra.* What, then, does
the testimony of the plaintiff show the facts to be, as
known to Ascheim at the time of commencing his action?
Bearing in mind that the whole controversy in that case
turned upon the question as to whether the mine was de-
veloped by the parties, Wright, Avery and Mocks, in
partnership, and with the understanding that they should
share in any discoveries, it shows that Mocks was earnestly
and stoutly maintaining to Ascheim that such was the
fact. This is clearly shown by the complaint put in evi-
dence by the plaintiff, not only that he was so reporting
to Ascheim, but that he swore to it positively, giving cir-
cumstances and details in support of it. It shows that he
knew the fact that a partnership did exist between the par-
ties as to the lagging contract. It further shows that he
knew that all the parties were actively engaged in getting
out the lagging, and that the entire proceeds of all that was
earned by them jointly were used in developing the mine;
that but one camp was maintained in both enterprises;
that the lagging account with him was largely over-
drawn to maintain the camp and develop the mine. It
further shows that he knew that Avery had been ad-
mitted to participation in the mine, on account of the
fact that the proceeds of the lagging contract had been
used in its development. The only fact known to him,
tending to refute all this, was the fact that the other
parties in interest denied Mocks' right. This is always
true in actions for malicious prosecution. In bringing a
civil action, the fact that the action was brought presup-
poses that the right claimed is denied. We think these
facts show that probable cause existed for bringing the

action.  The plaintiff by his testimony has not even at-
tempted an explanation as to how or by what right he
was appropriating Mocks' interest in the lagging contract
to his own individual use.  He admits that it was done,
and claims there was no contract or agreement authorizing
it, and his witness Avery, who was interested with him,
says "he didn't know where Mocks was standing in all this
matter, or what he was getting."  It is interesting in this
connection to note how Avery, in his testimony before
quoted, accounts for the interest he got in the mine.  It
is but fair to say that he himself, in his testimony, states
a case that would have entitled Mocks in a court of equity,
as a matter of right, to share in what he received.  If
the plaintiff and Avery, by their unauthorized and unlaw-
ful appropriation of what belonged to Mocks, have thereby
created circumstances from which damaging inferences
might be drawn, they must abide the consequences: *Jones*
v. *Jones*, 71 Cal., 92.

We think that the facts shown by the plaintiff's testi-
mony at least fail to establish want of probable cause.  If
this were not so, the testimony on the part of the de-
fendant fully establishes the fact that he did have proba-
ble cause for bringing the action.  Besides his own tes-
timony, he proved by at least two witnesses, not only that
they informed him before the suit was brought that Wright
and Avery had told them that Mocks was a partner in the
mine, but that such was the fact.  He proved by still
another that he was present when Wright and Avery
offered Mocks a share, less than one-fourth, to compromise
his claim, and that before suit was brought he informed
the plaintiff of it.  He further showed, by Judge Hark-
ness, who was then acting as his attorney, that he laid all
the facts known to him before Harkness, who took the
matter under advisement, examined Mocks as to his state-
ment, and after all this advised the bringing of the suit.
While this may have raised a question of fact, for the jury
to disregard it would be so plainly against the weight of
evidence that we should not hesitate to reverse the judg-
ment on that ground: *Moore* v. *Railroad Co.* (Minn.);
*Burton* v. *Railroad Co.*, 33 Minn., 189.

It is unnecessary to discuss the other errors alleged. The judgment and order appealed from should be reversed, and a new trial ordered.

ZANE, C. J., and BOREMAN, J., concurred.