Shauna F. HODGES, Plaintiff
and Appellee,

v.

GIBSON PRODUCTS COMPANY, dba
Gibson's Discount Center, a Utah cor-
poration, and Chad Crosgrove, an indi-
vidual, Defendants and Appellants.

No. 20929.

Supreme Court of Utah.

April 3, 1991.

F. Robert Bayle, Andrea C. Alcabes, Salt Lake City, for Gibson Products Co.

Chad Crosgrove, Thomas R. Karrenberg, Salt Lake City, for Shauna F. Hodges.

STEWART, Justice:

Gibson Products Company and Chad Crosgrove, manager of Gibson's West Valley store in Salt Lake County, appeal a judgment holding them liable for malicious prosecution of a former Gibson employee, Shauna F. Hodges. Gibson also appeals the judgment holding it liable to Hodges for wrongful termination of her employment.

## I. FACTS

Because Gibson and Crosgrove attack the sufficiency of the evidence, we rely on the facts most favorable to the verdict.

As store manager, Crosgrove closed out the cash registers at the end of every business day and placed the checks, cash, and cash register tapes from each register in separate money bags marked with the number of the register from which they were taken. After the store closed, Crosgrove placed the money bags in a safe near the service desk on the first floor for overnight keeping, and the next morning, he retrieved the bags from the safe and took them upstairs to a secure room where Hodges, a part-time bookkeeper, counted the receipts from each bag and checked the sum against the amount shown on the register tape for each cash register. She then recorded the total receipts from each register, entered the grand total from all registers on a daily report form, and prepared a bank deposit to be made by Crosgrove.

On the morning of September 4, 1981, Hodges went to the secure room, where she obtained the prior day's receipts which had been placed in the money bags together with the cash register tapes. She counted the receipts, filled out the daily report, and made out a bank deposit slip. When her tasks were completed, she went home. Company policy called for Crosgrove to deposit the receipts by 3 p.m. that day. However, around 4 p.m. Glen Murray, the assistant store manager, looked at the daily report prepared by Hodges and noticed that it showed no receipts for cash register No. 4. He checked to make sure that register No. 4 had been used the previous day and told Crosgrove of the discrepancy. After being informed of the missing money, company officials came to the store, and Crosgrove called Hodges and told her to return to the store. Crosgrove stated that when he first went to the secure room, he found part of a tape from register No. 4 in the wastebasket. Later, additional tapes, void slips from register No. 4, and torn deposit slips for Mrs. Hodges' personal bank account were found in a garbage bag. The missing checks from register No. 4 were found in the bag for register No. 2, and the empty bag for register No. 4 was found at the service desk. Crosgrove initially testified that upon returning to the secure room, he found some checks from register No. 4 in bag No. 2. Unless he had had sufficient time, however, to laboriously check the tape for register No. 2 line by line to determine which checks in bag No. 2 had not been taken at that register, he must have had previous knowledge about the misplacement of the checks. Crosgrove also testified, somewhat inconsistently, that he could not identify which checks came from register No. 4 until after a corporate accountant performed an audit. The audit revealed that the checks that should have been in the bag for register No. 4 had been put in the bag for register No. 2 and an amount of cash that equaled those checks had been withdrawn.

When Hodges returned to the store on September 4, she was confronted by Crosgrove and charged with stealing the money. She denied receiving the bag for the receipts from register No. 4 and steadfastly denied stealing the money. She insisted then, and consistently thereafter, that she

had not received the money sack for register No. 4 from Crosgrove.

Several days later, Gibson management called Hodges to another meeting and again asked for an explanation. Once again she explained that she had not taken the money. Notwithstanding her protestation of innocence, Gibson officials stated that they would allow her to resign rather than be fired if she paid Gibson the missing amount of money. Again asserting her innocence, she declined to resign.

Gibson suspended her from work on September 8, 1981, and on September 9, 1981, Crosgrove, Ron Harris, Gibson's auditor, and Bob Cornett, Gibson's general manager, went to the police and made an accusation of theft against Hodges. Although Crosgrove had had access to all the money bags containing register receipts during the night of September 3 and the morning of September 4, before they were given to Hodges, and was apparently the only other person to have had any such access to the bags, Gibson did not investigate the possibility that Crosgrove might have stolen the money and instead pointed the finger of blame at Hodges. Because Gibson had not at that time discovered that Crosgrove was in fact stealing both money and merchandise from Gibson, Crosgrove did not, of course, inform the police or other Gibson officials that he had been stealing substantial sums from Gibson during a period which included the month of September 1981. Hodges was arrested, handcuffed, and charged with theft. Following a preliminary hearing, she was bound over for a trial scheduled for May 12, 1982.

Before Hodges' trial could be held, a Gibson company audit discovered that Crosgrove had embezzled some $9,000 in cash and goods during a period that included the loss attributed to Hodges. Crosgrove's scheme of embezzlement utilized a method known as "lagging" bank deposits by which he retained a day's cash receipts, refrained from making a bank deposit, and then made up the deposit out of subsequent receipts. Gibson did not charge Crosgrove with theft, despite his confession and the large amount taken; rather, he was permitted to resign on the condition that he repay Gibson. On March 14, 1982, seven weeks before Hodges' scheduled trial date, Crosgrove resigned.

Gibson officials did not inform the prosecuting attorney in Hodges' case of Crosgrove's thefts until the eve of the scheduled trial, almost two months after the company became aware of Crosgrove's thefts. In light of Crosgrove's admitted thefts and the fact that he was Gibson's chief witness against Hodges, the prosecutor immediately dismissed the theft charge against Hodges. In May 1982, after eight months on suspension, and after the formal dismissal of the criminal charges against her, Gibson fired Hodges for the stated reason that she "failed to follow proper procedures."

Hodges sued both Gibson and Crosgrove for malicious prosecution and intentional infliction of emotional distress and Gibson alone for wrongful termination. Gibson counterclaimed for conversion. The jury found Gibson and Crosgrove liable for malicious prosecution, but not liable for intentional infliction of emotional distress, and Gibson liable for wrongful termination. The jury apparently found that Hodges suffered significant psychological trauma from the accusation and initiation of the criminal charge, was unable to find other employment as a result, and suffered a loss of wages during her suspension and after her discharge. The jury returned a verdict against Gibson for $70,000 in compensatory damages and $7,000 in punitive damages and a verdict against Crosgrove for $10,000 in compensatory damages and $1,000 in punitive damages. The jury found Hodges not liable on Gibson's counterclaim for conversion.

On this appeal, Gibson and Crosgrove contend that the evidence was insufficient to support the elements of a malicious prosecution action. In addition, Gibson contends that the jury instructions were erroneous with respect to the malicious prosecution claim, the wrongful termination claim, and damages.

**156**

## II. MALICIOUS PROSECUTION

The trial court instructed the jury that Hodges had the burden of proving the following four elements of the tort of malicious prosecution: (1) defendants initiated or procured the initiation of criminal proceedings against an innocent plaintiff;[1] (2) defendants did not have probable cause to initiate the prosecution; (3) defendants initiated the proceedings primarily for a purpose other than that of bringing an offender to justice; and (4) the proceedings terminated in favor of the accused. *See Kennedy v. Burbidge,* 54 Utah 497, 500–01, 183 P. 325, 326 (Utah 1919); *Callioux v. Progressive Ins. Co.,* 745 P.2d 838, 843 (Utah Ct. App.1987); *Restatement (Second) of Torts* § 653 (1977); *see also* W. Keeton, *Prosser and Keeton on the Law of Torts* § 119, at 871 (5th ed. 1984).

■ In deciding Gibson's and Crosgrove's contentions that the evidence was insufficient for the jury to find against them on the malicious prosecution claims, we defer to the jury and evaluate the evidence in a light favorable to the verdict. We accept the evidentiary inferences that tend to support the verdict rather than contrary inferences that support the appellants' version of the facts, even if we might have judged those inferences differently had we been deciding the matter in the first instance, and not as an appellate court. *See Cambelt Int'l Corp. v. Dalton,* 745 P.2d 1239, 1242 (Utah 1987). When the testimony of witnesses is in conflict, we accept that testimony which supports the jury's verdict, unless it is inherently implausible, and ignore the evidence which does not support the verdict, even if we might think it more convincing. *See Cottrell v. Grand Union Tea Co.,* 5 Utah 2d 187, 194, 299 P.2d 622, 626 (1956). For the appellants to overturn the jury verdict, therefore, they must set out in their briefs, with record references, all the evidence that supports the verdict, including all valid inferences to that effect, and demonstrate that reasonable people would not conclude that the evidence supports the verdict. *See Cottam v. Heppner,* 777 P.2d 468, 471 (Utah 1989); *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985).

We emphasize that it is counsel's professional duty to analyze the evidence with care and provide record citations for every asserted factual proposition. It is not the duty of an appellate court in a civil case to canvass the record on its own to determine the sufficiency of the evidence. Gibson and Crosgrove basically reargue the evidence as if they were presenting a jury argument. As written, their arguments are reasonable and have persuasive effect. From the point of view of appellate procedure, however, they ignore the rules designed to give stability to jury verdicts.

■ Before analyzing the sufficiency of the evidence on the various issues raised by Gibson and Crosgrove, we shall first address principles of agency law because they provide the context in which the sufficiency of the evidence determination must be made as to Gibson. We have recently reviewed the general principles governing the liability of an employer for an employee's tortious acts, both for negligent and intentional acts. *See Birkner v. Salt Lake County,* 771 P.2d 1053 (Utah 1989); *see also Barney v. Jewel Tea Co.,* 104 Utah 292, 139 P.2d 878 (1943). *Birkner* held that an employer is liable for the torts of its employees that are committed within the scope of employment, even if the tortious acts were intentional and not done solely to further the interests of the employer. The law established in *Birkner* is that an employer is vicariously liable for an employee's intentional tort if the employee's purpose in performing the acts was either wholly or only in part to further the employer's business, even if the employee was misguided in that respect. *See also* W. Keeton, *Prosser and Keeton on the Law of Torts* § 70, at 505 (5th ed. 1984).

---

1. There is authority that the innocence of the plaintiff should be an affirmative defense rather than an element of the plaintiff's claim. *See* W. Keeton, *Prosser and Keeton on the Law of Torts* § 119, at 885 (5th ed. 1984); *Restatement (Second) of Torts* § 657 comment b (1977). Because this issue has not been raised, we do not consider it on appeal. If there were error in the instruction, Hodges, rather than defendants, was the party harmed.

Thus, there is no vicarious liability for an employer when an employee acts entirely on personal motives unrelated to the employer's interests. *See id.* at 506; *see also Combes v. Montgomery Ward & Co.*, 119 Utah 407, 228 P.2d 272 (1951).

■ The rule of vicarious liability for intentional torts stated in *Birkner* also applies when a servant or an agent is authorized to initiate a legal action. The *Restatement (Second) of Agency* § 253 (1958) focuses on the precise issue:

A principal who authorizes a servant or other agent to institute or conduct such legal proceedings as in his judgment are lawful and desirable for the protection of the principal's interests is subject to liability to a person against whom proceedings reasonably adapted to accomplish the principal's purposes are tortiously brought by the agent.

Thus, the law stated in *Birkner* applies when an employee files a legal proceeding even if the servant or agent acts only "in part" to carry out the purposes of the principal. *Restatement (Second) of Agency* § 253 comment a.

■ Furthermore, personal knowledge material to the liability that a servant has when acting in a matter as to which the master has empowered the servant to act is also imputed to the master.[2] Section 272 of the *Restatement (Second) of Agency* capsulizes the rule:

In accordance with and subject to the rules stated in this Topic, the liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information.

The rule imputing a servant's knowledge to the master is of particular importance in tort cases based on negligence, malicious prosecution, and deceit. Comment c of § 272 states in part:

In determining tort liability, the knowledge which the actor has or should have

is usually of great importance. This is particularly true in cases of negligence and in torts which, like deceit or malicious prosecution, are based upon the fact that the defendant has acted improperly in view of the knowledge which he has.

Thus, the knowledge which Gibson's servants had in initiating the malicious prosecution action against Hodges and the responsibility for the initiation of the action itself is imputed, as a matter of law, to Gibson, if Gibson's servants acted within the scope of their authority and were motivated either in whole or in part to carry out Gibson's purposes.

Crosgrove and other Gibson officials, such as Ron Birch and Ron Harris, clearly acted within their delegated authority in bringing charges against Hodges; indeed, Crosgrove acted under express directions from corporate officials and also had the authority of a manager. Even if his authority as a manager were not sufficient to authorize him to initiate a criminal prosecution, it is clear that in this case he acted with the approval and under the direction of higher officials.

We turn now to the evidence supporting the specific elements of the cause of action for malicious prosecution in light of the above principles and other more particularized agency principles as stated below which bear upon specific elements of the cause of action.

### A. *Initiation of Criminal Proceedings Against One Who is Innocent*

■ Crosgrove, Ron Harris, a company auditor who checked the cash receipts and determined that the money was missing, and Bob Cornett, a general manager of Gibson, went to the West Valley Police Department, reported the missing money, and accused Hodges. These three clearly acted within the scope of their authority. This point is undisputed.

---

**2.** A distinction is sometimes made between a "tort of the corporation" and a corporation's imputed liability under the doctrine of respondeat superior. *See* 18B Am.Jur.2d *Corporations* § 2126 (1985). Imputed knowledge is relevant to the former concept. We need not make that distinction for purposes of this opinion.

As to Hodges' innocence, the jury expressly found by a special verdict that Hodges did not convert Gibson funds, and the evidence supports the jury's finding. First, Hodges testified that she was innocent, and the jury was entitled to believe her and refuse to credit any circumstantial evidence to the contrary. Her testimony by itself was sufficient evidence, but there was much more evidence that points to Crosgrove as the guilty party. He admitted to stealing approximately $9,000 in money and merchandise from Gibson during a period that included the critical month of September 1981, and the scheme he employed to steal the money was not inconsistent with the scheme used in the theft charged against Hodges.

Furthermore, Crosgrove was the only person other than Hodges who actually had possession of the cash register receipts in question. He had possession of all the register bags on the night of September 3 and the morning of September 4, when he would have been alone with them before they were turned over to Hodges. Also, the empty bag for register No. 4 was found at the service desk where Crosgrove would have taken exclusive control of the bags. Thus, he clearly had an opportunity to take the cash from the No. 4 bag and place the checks therefrom in bag No. 2. In addition, his statements concerning the contents of the garbage can where the tapes from register No. 4 and Hodges' bank deposit slip were found were inconsistent and could have led the jury to believe that he framed Hodges. Perhaps most telling, Crosgrove himself privately expressed doubt that Hodges was guilty.

### B. Absence of Probable Cause for Initiating a Prosecution

■ An accusation leading to the initiation of a criminal prosecution must be based on probable cause determined as of the time the action was filed. See Restatement (Second) of Torts § 662 comment e (1977).[3] The accuser must have sufficient information based on an adequate investigation to justify the conclusion that there is probable cause to initiate a criminal proceeding. See Potter v. Utah Driv–Ur–Self System, Inc., 11 Utah 2d 133, 135, 355 P.2d 714, 716 (1960). The accuser must have a reasonable basis for believing the accusation and must also subjectively believe the accusation to be true. See Sweatman v. Linton, 66 Utah 208, 218, 241 P. 309, 312 (1925); McKenzie v. Canning, 42 Utah 529, 530–31, 131 P. 1172, 1172–73 (1913); Wright v. Ascheim, 5 Utah 480, 491, 17 P. 125, 131 (1888). Comment j to § 662 of the Restatement (Second) of Torts provides the following definition of probable cause:

> In summary, it may be said that the defendant has probable cause only when a reasonable man in his position would believe, and the defendant does in fact believe, that he has sufficient information as to both the facts and the applicable law to justify him in initiating the criminal proceeding without further investigation or verification.

Because an essential component of probable cause is that the person responsible for initiating the action must personally believe the accused to be guilty, and because the jury could have found from Crosgrove's own admission that he did not believe Hodges guilty of the theft, the jury could reasonably have found that Crosgrove lacked probable cause. Restatement (Second) of Torts § 662, comment c provides: "A private prosecutor can not have probable cause for initiating criminal proceedings against another if he does not believe that the accused was guilty of the crime charged against him."

---

**3.** The Restatement (Second) of Torts § 662 (1977) provides a three-part standard for determining whether a defendant has probable cause in initiating an action for malicious prosecution:

> One who initiates or continues criminal proceedings against another has probable cause for doing so if he correctly or reasonably believes

> (a) that the person whom he accuses has acted or failed to act in a particular manner, and

> (b) that those acts or omissions constitute the offense that he charges against the accused, and

> (c) that he is sufficiently informed as to the law and the facts to justify him in initiating or continuing the prosecution.

The jury was also entitled to find that Gibson did not have probable cause. Crosgrove admitted embezzling funds during a period that included the date here in question; only two people had actual possession of the stolen money after it had been removed from the cash register on September 3, i.e., Crosgrove and Hodges. Crosgrove had possession of the stolen money the night of September 3 and the morning of September 4; assistant store manager Glen Murray, not Crosgrove, brought to light the fact that the receipts from register No. 4 were missing; and Crosgrove employed an embezzling scheme that was not unlike the method used to take the $580.

Furthermore, the jury could have found that the evidence most strongly implicating Hodges, the torn deposit slips in the garbage can in the secure room, was either innocently placed there or was placed there by Crosgrove as part of a frame-up. At the least, the jury was entitled to find that Gibson's investigation was inadequate and insufficient to provide a basis for probable cause and therefore failed to justify such serious action as initiating a felony prosecution. *See Cottrell v. Grand Union Tea Co.*, 5 Utah 2d 187, 193, 299 P.2d 622, 626 (1956). The issue of probable cause is preeminently a jury question, and the jury clearly had sufficient evidence to support the conclusion that Gibson did not have probable cause.

In addition to the facts just recited, Crosgrove's knowledge was imputed to Gibson as a matter of law, and Gibson was liable for Crosgrove's conduct, under the black letter agency principles explained above. *See Restatement (Second) of Agency* § 253, § 272 comment c; *see also Birkner v. Salt Lake County*, 771 P.2d 1053, 1056 (Utah 1989).

Furthermore, agency law deals even more specifically with the vicarious liability of a master for the acts of a servant in malicious prosecution cases than the general principles stated above. Section 246 of the *Restatement (Second) of Agency* states:

A master is subject to liability for the tortious institution or conduct of legal proceedings by a servant acting within the scope of employment.

Section 253 makes clear that these principles apply with special force in malicious prosecution cases:

A principal who authorizes a servant or other agent to institute or conduct such legal proceedings as in his judgment are lawful and desirable for the protection of the principal's interests is subject to liability to a person against whom proceedings reasonably adapted to accomplish the principal's purposes are tortiously brought by the agent.

Under comment a, however, "The principal is liable only if the conduct of the agent is, in part at least, to carry out the purposes of the principal." *See also Birkner*, 771 P.2d at 1057.

Although Crosgrove may have acted partly to deflect suspicion from himself to Hodges, he also acted within the scope of his authority by acting to further Gibson's interest. Crosgrove not only had prior consent, if not direction, from Gibson management to initiate the proceedings, but he was also accompanied by two Gibson officers to the police department to make the accusations. Gibson's purpose was clearly served by that accusation, as evidenced by Gibson's attempt to use the leverage of the prosecution against Hodges to induce her to pay the missing money. That strategy continued after the accusation against Hodges was made and even after Crosgrove's termination for theft, or at least the jury could have so found. Thus, the jury could have found that Crosgrove did not act solely in his own interest and was legitimately entitled to find that he acted to further Gibson's interest. *Cf. Sweatman v. Linton*, 66 Utah 208, 241 P. 309 (1925).

█ Gibson argues that its conduct was vindicated because, by relying on the prosecutor's judgment in initiating the charge against Hodges, it established a valid affirmative defense. Under Utah law, reasonable reliance on the advice of counsel is an affirmative defense when the issue is whether particular conduct meets the ele-

ments of some crime. *See Perkins v. Stephens*, 28 Utah 2d 436, 437, 503 P.2d 1212, 1212 (1972); *Potter v. Utah Driv–Ur–Self System, Inc.*, 11 Utah 2d 133, 135, 355 P.2d 714, 716 (1960); *Cottrell v. Grand Union Tea Co.*, 5 Utah 2d 187, 189, 299 P.2d 622, 623 (1956); *Sweatman v. Linton*, 66 Utah at 218, 241 P. at 312.

▮▮▮▮ An accuser may justifiably rely on the advice of counsel as to the existence of probable cause only if the advice is sought in good faith and after a full disclosure to counsel of the accuser's knowledge and information based on a reasonable investigation by the accuser. *See Potter*, 11 Utah 2d at 134–35, 355 P.2d at 716–17; *Wendelboe v. Jacobson,* 10 Utah 2d 344, 348, 353 P.2d 178, 181 (1960); *Sweatman*, 66 Utah at 218, 241 P. at 312; *see also Restatement (Second) of Torts* § 666 (1977). Reliance on the advice of counsel includes reliance on a prosecuting attorney's conclusion that a prima facie case exists.

The evidence supports the jury's rejection of Gibson's reasonable reliance defense. The jury was entitled to believe that Gibson failed to make an adequate investigation and also failed to make a full presentation to the prosecutor of the facts that it knew and was charged with knowing under agency law.

▮▮▮▮ Gibson contends that instruction No. 34 set a standard that was too high with respect to its duty to investigate and its reliance on counsel. That instruction stated:

> The officers and agents of Gibson Products Co. should have been entirely familiar with the facts and circumstances surrounding the allegations they made to the West Valley Police concerning the plaintiff. They were required to be sufficiently informed of the facts to initiate the criminal proceedings without any further investigation.

Gibson's argument is that the instruction is "unsupported by case law and is totally

unreasonable, especially in light of the evidence that defendants/appellants relied on the advice of the prosecutor in evaluating the sufficiency of the evidence."

Instruction No. 34 followed this Court's language in *Cottrell*, 5 Utah 2d at 193–94, 299 P.2d at 626.[4] Although we agree that the first sentence of the instruction, which stated that Gibson had to be "entirely familiar with the facts and circumstances surrounding the allegations," was inappropriately absolute, that sentence was modified by the second sentence which required only that Gibson "be sufficiently informed of the facts...." The instruction was certainly not ideal, but read in its entirety, we do not think it reversible error.

Section 662(c) of the *Restatement (Second) of Torts* states that the defendant must correctly or reasonably believe that he or she is sufficiently informed as to the law and the facts to justify initiating or continuing the prosecution. The jury reasonably could have believed that Gibson's investigation was inadequate because it failed to investigate the possibility that Crosgrove, the only other person who had a clear opportunity to take the money, might have been the guilty person. Because Crosgrove had access to the money bags before Hodges received them from Crosgrove, he should have been subjected to some scrutiny, especially in view of his inconsistent and suspicious statements about the torn tapes and deposit slip found in the garbage and the checks from register No. 4 found in the bag for register No. 2.

### C. *Improper Purpose*

A plaintiff must also prove that the criminal proceedings a defendant initiates must have been initiated primarily for a purpose other than to bring an offender to justice. *See Restatement (Second) of Torts* § 668 (1977). Gibson and Crosgrove contend that the jury could not reasonably have found

---

4. The Court's language in *Cottrell* was not intended to serve as an instruction. The language of the Court's opinion relied on for the instruction was part of the Court's reasoning in support of the result reached in the case. As shown by this case, using such language from an appellate opinion for an instruction may be risky business.

that they acted for any other purpose than that of bringing an offender to justice.

With respect to Crosgrove, the jury could have concluded from the evidence that one of Crosgrove's purposes was to cover up his own theft and deflect suspicion to Hodges. Although that purpose was only attributable to Crosgrove as an individual, and not to Gibson, there was other evidence that independently justified the jury's finding that Gibson had an improper purpose, apart from Crosgrove's ulterior motive.

Gibson used the threat of criminal prosecution as leverage to force Hodges to pay Gibson the missing money. A Gibson official told Hodges that Gibson would not prosecute her if she would pay the missing $580. When Hodges refused to pay, Gibson presented its accusation to the police the next day. Eight months later, the day after the prosecutor dismissed the criminal case against Hodges and six weeks after Crosgrove's defalcations came to light, Gibson fired her "for not following proper procedures." Not only did Gibson use the threat of a criminal prosecution in an extortionate fashion, but even after Gibson had clear notice that Crosgrove might well have been the responsible person, it still left Hodges to live with the embarrassment, dread, and expense of a criminal trial for a lengthy time.

 The only proper purpose for initiating criminal proceedings is to bring an offender to justice. The declared policy of this state is that it is imperative to keep the criminal law "inviolate." *See Haas v. Emmett*, 23 Utah 2d 138, 139, 459 P.2d 432, 433 (1969). To use criminal proceedings to force another to pay money is unjustifiable, and that is so even if the accused lawfully owes the money to the accuser. *See id.; Cottrell v. Grand Union Tea Co.*, 5 Utah 2d 187, 193, 299 P.2d 622, 626 (1956). The

*Restatement (Second) of Torts*, § 668 comment g, states: "[O]ne who initiates the proceedings to force the accused to pay money or to turn over land or chattels to the accuser, does not act for a proper purpose. This is true although the money is lawfully owed to the accuser...." [5]

The jury was entitled to find that Gibson improperly used the criminal prosecution against Hodges to pressure her to pay Gibson the missing money.

### D. *Termination in Favor of Accused*

Finally, a plaintiff must prove that the criminal proceedings were terminated in favor of the accused. A favorable termination of a criminal prosecution occurs, *inter alia*, when the proceedings against the accused are dismissed by "the formal abandonment of the proceedings by the public prosecutor...." *Restatement (Second) of Torts* § 659(c) (1977).

Defendants argue that the trial court erred in instructing the jury that "the criminal action against the plaintiff was dismissed by the court and that it was therefore terminated favorably on behalf of the plaintiff." In essence, the instruction informed the jury that the court had ruled as a matter of law on the issue. The trial court did not err. Even if the issue were one of fact, there is no dispute whatsoever that the action against Hodges was dismissed on the motion of the prosecuting attorney. On these facts, only one conclusion was permissible under the applicable law.

### III. DAMAGES

### A. *Direct and Vicarious Liability*

Defendants assert (1) that one of the jury instructions was flawed because it allowed the jury to award special damages in excess of the dollar amount pleaded in the

---

5. We do not mean to imply that an employer may not present an employee who is factually guilty of theft with the choice of returning stolen property or being subject to a criminal prosecution. But an employer, or someone else in a similar position, must be correct on the issue of guilt. Ordinarily, one who seeks to recover property improperly obtained or detained must

resort to civil process, and that is especially true when there is some legitimate issue as to whether the one in possession has lawful possession or when the payment of a debt is the issue. Clearly, use of the criminal law, or threat of its use, is inappropriate in such cases. In the instant case, the jury expressly found that Hodges did not take Gibson's money.

complaint, (2) that the evidence did not support the damages awarded, and (3) that the issue of punitive damages should not have been submitted to the jury.

The complaint alleged that "plaintiff has been injured and suffered damages including, but not limited to, loss of wages, medical expenses, severe emotional distress, and mental anguish requiring professional therapy, and further pain and suffering at least in the amount of $75,000.00...."

The complaint prayed for judgment as follows:

1. In the sum of $75,000.00 and such other sum as plaintiff shall establish by proof at time of trial;

2. Exemplary damages at least in the amount of $100,000.00;

3. For costs of suit incurred herein, including reasonable attorneys fees; and

4. For such other and further relief as the court deems just.

The trial court instructed the jury in instruction No. 46:

The plaintiff alleges that by reason of her claimed injuries, for which she claims the defendants are liable, she has sustained general damages in the sum of $200,000.00 for severe emotional distress, mental anguish and pain and suffering, and has lost an additional sum of $26,-515.00, on account of the costs of the therapy that she has undergone as a result of the malicious prosecution, loss of wages, and cost of legal fees for defense of the criminal proceeding.

These allegations are not evidence, but are merely the extent of the plaintiff's claims, and must not be considered by you as evidence in the case.

The jury awarded a total of $80,000 in compensatory damages, $70,000 against Gibson and $10,000 against Crosgrove. It also awarded $8,000 in punitive damages, $7,000 against Gibson and $1,000 against Crosgrove.

■■■ Instruction No. 46 was not erroneous because it permitted the jury to award more than the amount of general damages alleged in the complaint. Plaintiff was entitled to the general damages

proved, even though more than the amount alleged by the complaint. *See* Utah R.Civ.P. 54(c). The amount of damages awarded was justified by the evidence.

■■■ Special damages are a particular type of damages which are a natural consequence of the injury caused but are not the type of damages that necessarily flow from the harmful act. *See Cohn v. J.C. Penney Co.*, 537 P.2d 306, 307 (Utah 1975). One claiming special damages must plead each type of damage specifically so that the opposing party has an adequate opportunity to defend against the plaintiff's claims.

■■■ The complaint sought damages for lost wages, medical expenses, and severe emotional distress. Those allegations satisfied the requirement of Rule 9(g) of the Utah Rules of Civil Procedure, that special damages must be specifically pleaded. However, the law does not require that the exact dollar amount of special damages be specifically pleaded. *See Jones v. United Gas Improvement Corp.*, 383 F.Supp. 420, 423 n. 2 (E.D.Pa.1974); *United Ins. Co. of America v. B.W. Rudy, Inc.*, 42 F.R.D. 398, 405 (E.D.Pa.1967); *Cox v. Johnston*, 484 P.2d 116, 120 (Colo.Ct.App.1971); *see also Cohn v. J.C. Penney Co.*, 537 P.2d 306 (Utah 1975); 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1311 (1990).

■■■ Finally, defendants contend that the trial court erred in allowing the jury to award punitive damages. Their argument is that in initiating the prosecution against Hodges, defendants were prompted by a reasonable belief that Hodges had committed a theft and that a reasonable belief necessarily negates the required state of mind necessary to support a claim for punitive damages. *See Johnson v. Rogers*, 763 P.2d 771, 774 (Utah 1988); *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 337 (Utah 1985); *Synergetics v. Marathon Ranching Co.*, 701 P.2d 1106, 1112–13 (Utah 1985). If defendants were guilty only of simple negligence, inadvertence, mistake, or error of judgment, they would be correct. *See Behrens v. Raleigh*

*Hills Hosp., Inc.*, 675 P.2d 1179, 1186 (Utah 1983).

Defendants argue that there is no evidence that Gibson's employees acted "willfully or maliciously" in presenting evidence to the prosecutor or in terminating Hodges' employment and that even if Crosgrove initiated the prosecution against Hodges to cover his own misdeeds, his malice cannot be imputed to Gibson for purposes of imposing punitive damages against Gibson. That, however, is not the law.[6]

 A master may be liable for punitive damages under certain conditions. *See Johnson v. Rogers*, 763 P.2d 771, 776–78 (Utah 1988). In *Terry v. Zions Cooperative Mercantile Institution*, 605 P.2d 314 (Utah 1979), *overruled on other grounds, McFarland v. Skaggs Companies, Inc.*, 678 P.2d 298 (Utah 1984), this Court held that, under the doctrine of respondeat superior, an employer was liable for punitive damages based on a low-level employee's (i.e., security officer's) tortious and malicious acts of false arrest and false imprisonment.

As discussed above, the jury was entitled to find that Crosgrove acted knowingly and maliciously toward Hodges. Because Crosgrove was a manager and acted in his managerial capacity, Gibson is also liable, through Crosgrove, for punitive damages. In *Johnson v. Rogers*, 763 P.2d 771, 778 (Utah 1988), we relied in most part on the *Restatement (Second) of Torts*, §§ 909(b) and (e) to sustain the availability of punitive damages against an employer on the basis of vicarious liability. Section 909 states:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
>
> (a) the principal or a managerial agent authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or

(c) *the agent was employed in a managerial capacity and was acting in the scope of employment,* or

(d) the principal or a managerial agent of the principal ratified or approved the act.

(Emphasis added.) *Accord Restatement (Second) of Agency* § 217C (1958). Section 909(c), *Restatement (Second) of Torts*, and § 217C(c), *Restatement (Second) of Agency,* state the accepted rule that a master or other principal can be liable for punitive damages based on the conduct of a managerial agent. The punitive damage award against Gibson must therefore be sustained, at least as to the malicious prosecution claim, because the jury could have found that Crosgrove acted with actual malice toward Hodges and did so in his managerial capacity and within the scope of his employment.

Our ruling in this case on punitive damages is supported not only by our own prior cases, but also by a number of other courts in factual contexts similar to this case. *See, e.g., Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 122 A.2d 457 (1956); *Moore v. Target Stores, Inc.,* 571 P.2d 1236 (Okla.Ct. App.1977). *See generally* Annotation, *Principal's Liability for Punitive Damages Because of False Arrest or Imprisonment, or Malicious Prosecution, By Agent or Employee,* 93 A.L.R.3d 826 (1979 & Supp.1990).

**B.** *Liability For Damage For Wrongful Discharge*

Because the jury verdict awarding punitive damages did not make clear whether the punitive damages were based on the malicious prosecution claim or on the wrongful termination claim, the issue arises whether the punitive damage award

---

**6.** In *First Security Bank of Utah v. J.B.J. Feedyards, Inc.,* 653 P.2d 591, 598–99 (Utah 1982), we identified a number of factors the fact finder must consider in awarding punitive damages, i.e., the nature of the alleged misconduct, the extent of the effect of the misconduct on the lives of the plaintiff and others, the probability of future recurrence of such misconduct, the relationship between the parties, the relative wealth of the defendant, the facts and circumstances surrounding the misconduct, and the amount of the actual damages awarded.

may stand. For clarity, we explain why this issue needs to be addressed.

In the next section of this opinion, we hold that the jury verdict that Gibson was liable for wrongful discharge based on a public policy exception to the employment-at-will doctrine should be affirmed. However, we do not address the issue whether the public policy exception to the at-will doctrine sounds in tort or contract, because that issue was not raised in either the trial court or this Court. A decision on that issue should await a proper presentation of the issue. Nevertheless, the answer to that question would, of course, ordinarily determine whether punitive damages may be awarded in an employment termination case based on an exception to the at-will doctrine. Because the jury did not specify whether it awarded punitive damages on the basis of the malicious prosecution claim or the wrongful termination claim, we must, out of fairness to Gibson, assume for the purpose of this case that the wrongful discharge claim sounds in contract and that punitive damages may not be awarded for that claim. Therefore, we now analyze the issue whether the punitive damage award may be sustained notwithstanding our assumption.

■ Several general principles concerning the sustainability of jury verdicts give guidance. First, we exercise "every reasonable presumption in favor of the validity of a general verdict." *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 301 (Utah 1982). To give effect to that presumption, we look to pleadings, evidence, instructions, verdict forms, and the manner in which the case was tried to determine whether possible error in the verdict is reversible. In *Cook Associates, Inc. v. Warnick*, 664 P.2d 1161, 1163 (Utah 1983), we stated:

> General verdicts are to be construed with a view to sustaining the verdict and effectuating the intention of the jury if possible. Where that intention is not clearly apparent from the verdict itself, inferences may be drawn from the evidence, the pleadings, the jury instruc-

tions, and other relevant portions of the record.

(Citations omitted.)

■ The nature and amounts of the damages awarded by the jury strongly indicate that the jury awarded damages only on the malicious prosecution claim. The damages awarded against Crosgrove had to have been awarded only on the malicious prosecution claim. The compensatory damages assessed against Crosgrove were in the amount of $10,000. The jury also awarded $1,000 punitive damages, or ten percent of the compensatory damages, against Crosgrove. Significantly, the jury awarded $7,000 punitive damages against Gibson, which amounted to ten percent of the $70,000 compensatory damages assessed against Gibson. We think that the conclusion can reasonably be drawn from the obvious proportionality of the compensatory and punitive damage awards that both those awards against Gibson and Crosgrove were based on the same claim for relief, i.e., the malicious prosecution claim, which was the only claim against Crosgrove. Furthermore, the only real malice that could be found related to the malicious prosecution claim, not to the wrongful discharge claim. Thus, it is reasonable to conclude that the punitive damages were awarded only on the malicious prosecution claim.

There is another line of authority that requires sustaining the punitive damage award against Gibson. In *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 302 (Utah 1982), we held:

> [W]here more than one cause of action has been submitted to a jury and where one of those causes of action was error-free, supported by substantial evidence, and an appropriate basis for the general verdict, the judgment on that verdict will be affirmed, even though the evidence was insufficient to sustain the verdict on one of the other causes of action submitted.

(Citations omitted.) *See also Rodgers v. Kemper Constr. Co.*, 50 Cal.App.3d 608, 617, 124 Cal.Rptr. 143, 148 (1975).

Here the issue is not the sufficiency of the evidence on one of two claims as in *Leigh Furniture*, but rather the assumed inappropriateness of punitive damages for one of two claims. That difference, at least on the facts of this case, is not a distinction. Because the malicious prosecution claim was submitted under proper damage instructions and supported by substantial evidence, and because the entire award of damages against Gibson, both compensatory and punitive, is sustainable on that claim alone, *Leigh Furniture* requires that we affirm the damage awards.

## IV. WRONGFUL TERMINATION

This case was tried before our decision in *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033 (Utah 1989), which signaled a limited departure from the at-will employment doctrine that was restated in *Bihlmaier v. Carson*, 603 P.2d 790 (Utah 1979), and sometimes in recent years has been referred to as the *Bihlmaier* doctrine. The trial court presciently recognized a cause of action for wrongful discharge as an exception to the at-will doctrine that had not theretofore been recognized in Utah. Instruction No. 43 stated:

> Plaintiff was free to quit her employment with defendant at any time, and defendant was free to discharge plaintiff at any time without cause. However, if you find from a preponderance of the evidence that the plaintiff was discharged on the basis of a false criminal accusation known to defendant Gibson Products Co. to be false, then you may find the defendant Gibson Products Co. guilty of wrongful discharge of the plaintiff.

Gibson contends that the instruction was in error for one reason, and one reason only: the law in Utah recognizes no cause of action for wrongful discharge of an employee hired for an indefinite term under the law stated in *Bihlmaier. See also Crane Co. v. Dahle*, 576 P.2d 870 (Utah 1978); *Held v. Am. Linen Supply Co.*, 6 Utah 2d 106, 307 P.2d 210 (1957); *Williams v. West Jordan City*, 714 F.2d 1017 (10th Cir.1983) (applying Utah law).

In *Berube v. Fashion Centre Ltd.*, 771 P.2d 1033 (Utah 1989), three justices of this Court in dictum agreed that the at-will employment doctrine that arises from an indefinite-term employment contract is limited by a public policy exception. *See* 771 P.2d at 1042 (opinion of Durham, J., joined by Stewart, J.); 771 P.2d at 1051 (opinion of Zimmerman, J.). In *Caldwell v. Ford, Bacon & Davis Utah, Inc.*, 777 P.2d 483 (Utah 1989), four members of this Court stated that at least some principles of public policy limit the unbridled exercise of employer discretion in the discharge of an indefinite-term employee. The lead opinion in *Berube* recognized that the term "public policy" is a vague and elastic term in need of limitation so as not to provide an arguable basis for a lawsuit every time an indefinite-term employee is discharged. *Caldwell* squarely held that the public policy exception could not be read so broadly as to impose a requirement of "good cause" for the discharge of every indefinite-term employee. *See* 777 P.2d at 485 & 485 n. 2.

The requirement of good cause for the discharge of an employee provides employment security under many collective bargaining agreements and the employment security provisions of many, if not all, civil service systems. Although the need and justification for that kind of employment security is generally accepted under such agreements and systems, those needs and justifications are far less compelling, and in some instances quite inappropriate, with respect to many non-unionized private employers. In non-unionized private-sector employment, there is a legitimate place, at least in some instances, for broad employer discretion in terminating employment relationships, and there is also a legitimate correlative interest of employees in being able to quit for any or no reason at all, apart from relevant constitutional considerations.

In any event, it is not the purpose of public policy restrictions on the at-will employment doctrine to deprive employers of all discretion in discharging an indefinite-term employee. At this point, it is sufficient to declare that the public policy that

may be the basis for a wrongful discharge action should be defined in the first instance by legislative enactments and constitutional standards which "protect the public or promote public interest." *Berube*, 771 P.2d at 1043. In addition, relevant public policy may also be found in judicial decisions. *See id.*

Most criminal statutory prohibitions provide narrow and clear-cut definitions of a specific public policy designed to protect both society at large and specific individuals from antisocial acts. The law ought not to allow those prohibitions to be circumvented by employers who seek to secure an objective prohibited by the criminal law while avoiding a technical violation of the law because of the means used. When the means used to accomplish a prohibited end, that is, the discharge of an employee, runs counter to public policy, an action for wrongful discharge is an appropriate way to protect both the public interest and the employee from an employer's oppressive use of power.

■ Instruction No. 43 made clear in the first sentence that as a general proposition Hodges was free to quit her employment at any time and that Gibson was free to discharge her at any time "without cause." That correctly stated the general rule under the *Bihlmaier* doctrine. The instruction then went on, however, to state an exception to that rule. The jury could find Gibson guilty of a wrongful discharge if it found that Hodges was "discharged on the basis of a false criminal accusation known to defendant Gibson Products Co. to be false...."

Gibson objected to the instruction solely on the ground that there was no limitation on its right to discharge an indefinite-term employee. That objection has no merit in view of our recognition of a public policy exception to the at-will doctrine.

Gibson did not object to instruction No. 43 on the ground, generally, that the instruction failed to specify a valid public policy limitation to the at-will doctrine. Nor did Gibson object to the instruction on the ground that it failed to state an appropriate public policy exception rooted in a criminal statutory provision. Defendants' failure to specify any particular objection in the trial court to the limitation on the right of discharge constitutes a waiver. *See, e.g., Beehive Medical Elecs., Inc. v. Square D Co.*, 669 P.2d 859 (Utah 1983). That waiver was compounded by defendants' failure to raise such an objection in the briefs on this appeal.[7]

■ Ordinarily, we would not discuss further any possible error in the instruction with respect to the particular public policy exception to the at-will doctrine, but because this is the first case in which we have sustained a public policy limitation to the employment at-will doctrine, we will, nevertheless, analyze the instruction for the guidance of the bar and to show that whatever error there was did not cause manifest error resulting in a fundamental injustice. *See* Utah R.Civ.P. 51.

The issue we *sua sponte* address is whether instruction No. 43 incorporated an appropriate public policy of sufficient importance to warrant limiting Gibson's right to discharge at will. The instruction, although not as complete as it might have been, in effect rested on the public policy embodied in two relevant criminal statutes. The false criminal accusation statute, Utah Code Ann. § 76–8–506 (1990), provides:

A person is guilty of a class B misdemeanor if he:

(1) Knowingly gives or causes to be given false information to any law enforcement officer with a purpose of inducing the officer to believe that another has committed an offense[.]

The theft by extortion statute, Utah Code Ann. § 76–6–406 (1990), provides in pertinent part:

---

7. Although there was no established public policy exception in Utah when this case was tried, some thirty-seven other jurisdictions have recognized such an exception. *See* Leonard, *A New Common Law of Employment Termination,* 66 N.C.L.Rev. 631 (1988). It is not too much to expect that counsel should have at least some general familiarity with such widely established law. Waiver under such circumstances is not unduly burdensome or unreasonable.

(1) A person is guilty of theft if he obtains or exercises control over the property of another by extortion and with the purpose to deprive him thereof.

(2) As used in this section, extortion occurs when a person threatens to:

. . . .

(d) Accuse any person of a crime or expose him to hatred, contempt, or ridicule;

. . . .

(i) Do any other act which would not in itself substantially benefit him but which would harm substantially any other person with respect to that person's health, safety, business, calling, career, financial condition, reputation, or personal relationships.

Although instruction No. 43 incorporated the gist of the false accusation statute, it did not include the requirement that the jury find that the false information be given to "any law enforcement officer with a purpose of inducing the officer to believe that another has committed an offense." Whether the failure to include that language would constitute reversible error had there been a proper objection raised in the trial court and pursued on the appeal, we need not now decide. The question is solely whether under Rule 51 of the Utah Rules of Civil Procedure the failure constituted a manifest error. We hold that it does not. The undisputed facts are that the false accusation against Hodges, made by Crosgrove for and on behalf of Gibson, was for the purpose of inducing the officer to believe that Hodges had committed an offense. It is also undisputed that a criminal charge was filed.

Likewise, instruction No. 43 did not incorporate each and every element that would have to be proved under § 76–6–406 to convict a defendant of the crime of theft by extortion or, in this instance, attempted theft by extortion. Specifically, the instruction did not require the jury to find that the accusation of a crime against Hodges was done for the purpose of depriving her of her property. Nevertheless, the jury was clearly required to find that that was the purpose of Gibson's actions when it found the elements of the malicious prosecution action. As noted above, one of the elements of that action is the bringing of an action for an unlawful or improper purpose. In essence, the jury had to find that the criminal proceedings against Hodges were initiated for a purpose other than bringing an offender to justice. *See Restatement (Second) of Torts* § 668 (1977). In this instance, that meant paying Gibson the missing money.

Again, the evidence is uncontested that by the prosecution of a criminal charge, Gibson sought to induce Hodges to pay it the money that had been stolen from the cash register bag. The record is undisputably clear that Gibson told Hodges it would not prosecute her if she paid the money and that Gibson initiated charges against her only after her adamant refusal to pay based on her unwaivering assertion of innocence. In short, the undisputed evidence in the case, and the necessary finding of the jury of an improper purpose under the malicious prosecution claim, filled whatever hiatus existed in instruction No. 43 with respect to both the exortion and the false criminal accusation statutes. Under the holding of *Cook Associates, Inc. v. Warnick,* 664 P.2d 1161 (Utah 1984), that there is a presumption in favor of the validity of jury verdicts, we hold that, when viewed in light of the undisputed facts and necessary jury findings, instruction No. 43 produced no manifest injustice.

The declared policy of this state is that it is imperative to keep the criminal law inviolate and that it may not be used for achieving purposes other than bringing an offender to justice. To use criminal proceedings to force another to pay money is unjustifiable, even if the accused owes the money to the accuser. *See Haas v. Emmett,* 23 Utah 2d 138, 139, 459 P.2d 432, 433 (1969); *Cottrell v. Grand Union Tea Co.,* 5 Utah 2d 187, 193, 299 P.2d 622, 626 (1956). Section 668 comment g of the *Restatement (Second) of Torts* states that "one who initiates the proceedings to force the accused to pay money or to turn over land or chattels to the accuser, does not act for a proper purpose. This is true al-

though the money is lawfully owed to the accuser...." That policy is a weighty and significant part of the public policy of this state, especially when an employer violates it by means of a false criminal accusation or an act of attempted extortion.

Affirmed.

DURHAM, J., concurs.

HOWE, Chief Justice (concurring):

I concur, except I concur only in the result in part IIIB and part IV on the ground that the jury, without objection by any of the defendants, was permitted to render a general verdict. As explained by Justice Stewart and by Justice Zimmerman in his separate opinion, we have held in at least three cases that in such circumstances, we will affirm a general verdict even though one of the causes of action may be infested with error. *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293 (Utah 1982); *Barson v. E.R. Squibb & Sons, Inc.*, 682 P.2d 832 (Utah 1984); *Cambelt Int'l Corp. v. Dalton*, 745 P.2d 1239 (Utah 1987). I dissented to that rule in the first two cases, but acquiesced to it in *Cambelt*, recognizing that it was now the law in Utah. Under that rule, the award of punitive damages must be sustained, and any error in instruction No. 43 must be viewed as harmless.

ZIMMERMAN, Justice (concurring in the result):

I concur in part I of the opinion of Justice Stewart. I join in part II, subparts A, C, and D. I do not join in that portion of the introduction of part II that discusses principles of agency law and states that the knowledge of all Gibson's servants is imputed to Gibson. Similarly, I join in subpart B of part II, except that portion that states, based on the earlier discussion of agency law, that "Crosgrove's knowledge was imputed to Gibson...."

On the question of damages, I join subpart A of part III only to the extent that it finds no error in instruction No. 46, that it finds the evidence sufficient to support the punitive damage award against Crosgrove and Gibson each for their own conduct, and that it concludes that punitive damages were awardable against Gibson under section 909(c) of the Restatement (Second) of Torts for Crosgrove's conduct.

I join in subpart B of part III only to the extent that it upholds the punitive damage award against Gibson on the ground that "[w]hen a case is submitted to a jury on several alternative grounds and a general verdict is returned, we will affirm if the jury properly could have found for the prevailing party on any of the theories comprehended by the general verdict." *Cambelt Int'l Corp. v. Dalton*, 745 P.2d 1239, 1241–42 (Utah 1987) (citing *Barson v. E.R. Squibb & Sons, Inc.*, 682 P.2d 832, 835 (Utah 1984); *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 301–02 (Utah 1982)).

I do not join in part IV. As noted above and as Justice Howe's separate opinion affirms, there is no reason to reach the propriety of the verdict under the wrongful termination claim since it is otherwise sustainable. Were I to address the issue, I would have numerous points of disagreement with Justice Stewart's discussion of the general legal principles as well as the issues particular to this case. However, since his discussion on this point is not joined by a majority of the court, I choose to wait for a more appropriate case in which to deal with the so-called public policy exception to the at-will doctrine.

HALL, C.J., concurs in the concurring opinion of ZIMMERMAN, J.