Sherry JENSEN and Shayne Hipwell, individually and on behalf of all other heirs of Shelly Hipwell, and Ashley Michele Hipwell and Kaycie Shaylene Hipwell appearing by Shayne Hipwell as guardian ad litem, Plaintiffs, Appellants, and Cross–Appellees,

v.

IHC HOSPITALS, INC., dba McKay–Dee Hospital, and Michael J. Healy, M.D. and Does I through X, Defendants, Appellees, and Cross–Appellant.

No. 950164.

Supreme Court of Utah.

April 4, 1997.

Opinion Granting Rehearing
Aug. 22, 1997.

Rehearing Denied Sept. 25, 1997.

Richard D. Burbidge, Stephen B. Mitchell, Gary R. Johnson, Salt Lake City, and Simon H. Forgette, Kirkland, WA, for plaintiffs.

James W. Gilson, Kathy A. Lavitt, Salt Lake City, for IHC.

Elliott J. Williams, Kurt M. Frankenburg, Salt Lake City, for Dr. Healy.

ZIMMERMAN, Chief Justice:

The trial court granted summary judgment for defendants IHC Hospitals, Inc., dba McKay–Dee Hospital ("McKay–Dee"), and Michael J. Healy, M.D. ("Dr. Healy"), ruling that plaintiffs Sherry Jensen and Shayne Hipwell's action was barred by the medical malpractice statute of limitations, section 78–14–4 of the Utah Code. Jensen and Hipwell appealed the grant of summary judgment under section 78–2–2(3)(j) of the Utah Code. We reverse and remand to the trial court for resolution of a fact question relevant to the tolling of the statute of limitations.

A detailed recitation of the facts is necessary to understand the complex legal issues presented by this appeal. " 'Before we recite the facts, we note that in reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.' " *K & T, Inc. v. Koroulis,* 888 P.2d 623, 624 (Utah 1994) (quoting *Higgins v. Salt Lake County,* 855 P.2d 231, 233 (Utah 1993)).

Because McKay–Dee and Dr. Healy moved for summary judgment, we state the facts in the light most favorable to Jensen and Hipwell.

Sherry Jensen and Shayne Hipwell are, respectively, the surviving mother and husband of Shelly Hipwell. They seek to recover for Shelly's wrongful death on behalf of themselves and as legal guardians of Shelly's two minor daughters (collectively "Shelly's family"). On December 12, 1988, the day before a scheduled induced delivery of her second daughter, Shelly experienced severe abdominal pain and went to the emergency room of McKay–Dee Hospital. After being sent home, Shelly returned to McKay–Dee on December 13th for a caesarian delivery of her baby. Shelly experienced various complications at McKay–Dee after the delivery, which Shelly's family claims were the result of malpractice and negligence on the part of McKay–Dee and Dr. Healy, Shelly's obstetrician. On December 23rd, Shelly was transferred to the University of Utah Hospital for further treatment. At University Hospital, Shelly suffered anoxic brain damage after a resident physician punctured her heart with a biopsy needle, leaving her in a coma, totally and permanently disabled. Shelly subsequently died some three and a half years later, on May 27, 1992.

In early 1989, while Shelly was at University Hospital in a coma, Dr. Healy discussed Shelly's case with his brother, attorney Tim Healy. After this discussion, attorney Healy had discussions with the Healys' sister, Diane DeVries. In the course of those discussions, attorney Healy asked DeVries to call Shelly's family and recommend attorney Roger Sharp, a Salt Lake attorney who specialized in medical malpractice cases. DeVries had known Shelly's family for some time. DeVries contacted Shelly's family but did not tell them that the Healys were her brothers, nor did she tell them that she was also Dr. Healy's file clerk. Shelly's family retained attorney Roger Sharp on February 10, 1989, to represent Shelly in a medical malpractice case. Three days later, attorney Healy wrote to attorney Sharp, confirming a fee-splitting arrangement. Shelly's family was not aware of attorney Healy's involvement in the case or of Diane DeVries' relationship with Dr. Healy and attorney Healy. The letter from attorney Healy to attorney Sharp makes clear that attorney Healy was communicating with Dr. Healy about attorney Sharp's investigation and implies that attorney Sharp's investigation of Dr. Healy's treatment was to be minimal.

As part of his investigation, attorney Sharp sent a document request to Dr. Healy, seeking "a copy of all medical records regarding [Shelly] Hipwell." Dr. Healy did not produce a copy of all medical records, but instead produced a selective set of documents that he personally reviewed. Attorney Sharp never received a copy of Shelly's complete medical records from Dr. Healy. By letter, attorney Sharp also requested a copy of Shelly's complete medical records from McKay–Dee Hospital. However, he subsequently orally limited that request and ultimately received only limited medical records from McKay–Dee. On May 6, 1989, attorney Sharp and Shelly's family settled her case against University Hospital for $250,000, the amount of the previously effective statutory cap on damages against the University.[1]

In mid–1989, Shelly was transferred from McKay–Dee Hospital, to which she had returned from University Hospital on April 14, 1989, to the Greenery, a rehabilitation facility in Washington State. Carol Pederson, a social worker at the Greenery, contacted attorney Simon Forgette on August 10, 1989, to request that he provide an opinion of the settlement in Shelly's case and evaluate the conduct of her attorneys in settling the case. At that time, Forgette's memos to the file regarding the possible new case indicate that Forgette understood that Shelly's liver had been lacerated during her caesarian delivery at McKay–Dee. On August 29th, Forgette

1. This court struck down the statutory cap on medical malpractice damages as unconstitutional on May 1, 1989, in *Condemarin v. University Hospital*, 775 P.2d 348 (Utah 1989), approximately five days before Shelly's family agreed to the $250,000 settlement offered by the University. Attorney Sharp knew of our decision in *Condemarin* when the settlement was agreed to, and his actions in that case have been the subject of litigation. *See Hipwell v. Sharp*, 858 P.2d 987 (Utah 1993).

contacted Pederson, who assured him that she had the family's permission to discuss Shelly's case. She identified Sharp as Shelly's Utah attorney. That same day, Pederson wrote a letter to Forgette in which she stated, "Ms. Jensen [Shelly's mother] has requested you to offer an opinion on the settlement reached in this case, and advise the family regarding any further legal action which might be indicated." On September 18th, Forgette reviewed medical records provided by Pederson and asked that she arrange for a meeting with Ms. Jensen, Shelly's mother. His understanding at that time was still that Shelly's liver had been lacerated at McKay–Dee. Forgette's memo to his file also indicates that he needed to determine "the statute of limitations on bringing any claim against hospitals or against attorneys."

On October 19, 1989, Ms. Jensen, Shelly's mother, traveled to Washington and met with Forgette to discuss Shelly's case. Ms. Jensen orally retained Forgette on this date and Forgette was to request a copy of attorney Sharp's file. Forgette's memo to the file at this time indicates that he was working with a Utah attorney who was doing some background investigations regarding Shelly's case and the settlement with University Hospital. This attorney wanted to "remain in the background" because he had worked with attorney Sharp in the past and received a signifi-

cant amount of business from McKay–Dee. The memo to the file also indicates that, after meeting with Shelly's mother, Forgette's understanding was that Shelly's liver "had been either damaged or had burst" while she was at McKay–Dee. On October 20th, Forgette wrote to Sharp requesting a copy of his file on Shelly. By December 14th, Ms. Jensen still had not signed a formal retainer and Forgette had still not received Sharp's file. On that date, Forgette drafted a retainer agreement to send to Ms. Jensen, which provided that Forgette was to handle claims against McKay–Dee Hospital, University Hospital, Roger Sharp, attorney Healy and/or others. On December 26th, Forgette received a portion of Sharp's file, but he did not receive the entire file until February 15, 1990. In the meantime, the present plaintiffs, Ms. Jensen and Shayne Hipwell (Shelly's husband), signed Forgette's written retainer agreement on January 17, 1990.

When Forgette received Sharp's file on February 15th, he learned of attorney Healy's involvement in the case and learned that Sharp's file did not contain a complete set of medical records from Dr. Healy or McKay–Dee Hospital. Forgette did not file a notice of intent to commence suit in the instant case against McKay–Dee Hospital and Dr. Healy until almost two years later, on December 16, 1991.[2] Shelly Hipwell died on May 27, 1992,

---

**2.** Section 78–14–8 of the Utah Code provides that a medical malpractice action may not commence "unless and until the plaintiff gives the prospective defendant ... at least ninety days' prior notice of intent to commence an action." If the filing of the notice of intent comes less than 90 days before the end of the limitations period for filing a medical malpractice action, the limitation period "shall be extended to 120 days from the date of service of notice." *Id.* Further, within 60 days of filing a notice of intent, the plaintiff must submit a request for prelitigation panel review. *See* Utah Code Ann. § 78–14–12(1)(c)(2)(a). *But see Gramlich v. Munsey,* 838 P.2d 1131 (Utah 1992) (holding that action may not be dismissed for failure to file request for prelitigation review within 60 days of notice of intent). That section also provides that upon filing a request for prelitigation review, the statute of limitations is tolled until 60 days after the prelitigation panel issues its opinion. Utah Code Ann. § 78–14–12(3).

We note that Shelly's family filed its notice of intent on December 16, 1991, but did not file its

lawsuit until July 29, 1992, more than 120 days after filing the notice of intent. Both parties before this court briefed the issues as if December 16, 1989, the date two years before the filing of the notice of intent, was the relevant date for statute of limitations purposes. We can only assume that Shelly's family's failure to file its lawsuit within 120 days of that date was due to their having filed a request for prelitigation review and waiting for the panel's decision. However, we find no indication of this in the record. If Shelly's family did not file a prelitigation review request, the filing of the lawsuit more than 120 days after the filing of the notice of intent may be fatal to the entire suit. *See Millett v. Clark Clinic Corp.,* 609 P.2d 934 (Utah 1980) (holding that where notice of intent was filed less than 90 days before running of limitations period and lawsuit was not filed within 120 days of filing notice of intent, suit was properly dismissed). We do not address this issue because it was not presented to us.

and Forgette filed the complaint in this suit on July 29, 1992.

After allowing the parties to complete discovery, the trial court granted summary judgment to Dr. Healy and McKay–Dee on February 21, 1995, ruling that the two-year statute of limitations governing medical malpractice actions contained in section 78–14–4 of the Utah Code had run by December of 1991, when Forgette filed his notice of intent. On appeal, Shelly's family makes a series of arguments, which are summarized below.

First, Shelly's family contends that the wrongful death statute of limitations, section 78–12–28(2) of the Code, applies to their wrongful death claims. They argue that their claims cannot be barred until two years after Shelly's death because the wrongful death statute of limitations does not begin to run until the decedent's death. In the alternative, they argue that if the medical malpractice statute of limitations contained in section 78–14–4 of the Code applies in cases of wrongful death due to medical malpractice, the two-year period it contains should not begin to run until the decedent's death. We reject both these claims.

Second, Shelly's family asserts that the running of the statute of limitations on both Shelly's personal injury claims (which survived her death and are now asserted by her family) and their wrongful death claims should be tolled because of Dr. Healy's alleged fraudulent concealment of the facts upon which their claims are grounded. The trial court ruled that Shelly's family's oral retention of attorney Forgette on October 19, 1989, more than two years before the filing of the notice of intent, "demonstrated that Forgette was in possession of facts whereby he knew or should have known that [Shelly] Hipwell's condition was caused or possibly caused by negligence on the part of McKay–Dee Hospital and Dr. Healy." We conclude that this is a disputed issue of fact that precludes summary judgment.

Third, Shelly's family argues that Shelly Hipwell's minor children should be allowed to proceed with claims for wrongful death because the children's minority tolled the statute of limitations as to their claims. Last, Shelly's family argues that they should be allowed to proceed on their separate claims for common law fraud, which are governed by a three-year statute of limitations. We reject both claims.

Returning in depth to Shelly's family's first argument concerning the statute of limitations that applies to their wrongful death claims: Shelly's family reasons that because this is a claim for wrongful death, section 78–12–28(2) of the Code, which governs wrongful death, is the applicable statute of limitations, rather than the Medical Malpractice Act statute of limitations contained in section 78–14–4, as the trial court held. Shelly's family further argues that the two-year limit in the wrongful death statute does not begin to run until the decedent's death.

■ When we are faced with two statutes that purport to cover the same subject, we seek to determine the legislature's intent as to which applies. In doing this, we follow the general rules of statutory construction, which provide both that "the best evidence of legislative intent is the plain language of the statute," *Sullivan v. Scoular Grain Co.*, 853 P.2d 877, 879 (Utah 1993) (citing *Jensen v. Intermountain Health Care, Inc.*, 679 P.2d 903, 906 (Utah 1984)), and that " 'a more specific statute governs instead of a more general statute.' " *De Baritault v. Salt Lake City Corp.*, 913 P.2d 743, 748 (Utah 1996) (quoting *Pan Energy v. Martin*, 813 P.2d 1142, 1145 (Utah 1991) (citations omitted)). In this case, the Medical Malpractice Act's plain language indicates a legislative intent to have the statute apply to claims such as the ones Shelly's family seeks to bring.

■ The Utah Health Care Malpractice Act specifically provides, "No malpractice action ... may be brought unless it is commenced within two years after the plaintiff or patient discovers ... the injury." Utah Code Ann. § 78–14–4. The Act defines "malpractice actions" to which the Act was intended to apply as "any action against a health care provider, whether in contract, tort, breach of warranty, *wrongful death*, or otherwise, based upon alleged personal injuries relating to or arising out of health care rendered or which should have been rendered by the health care provider." *Id.*

§ 78–14–3(14) (emphasis added). Clearly, the legislature intended that the Utah Health Care Malpractice Act apply to actions for wrongful death based upon personal injuries arising out of medical malpractice. Further, this statute is more specific than the general wrongful death statute of limitations, applying as it does only to wrongful death actions arising out of medical malpractice. Therefore, we hold that the two-year statute of limitations governing medical malpractice actions covers this action for wrongful death arising out of medical malpractice.

Shelly's family next argues that if the medical malpractice statute of limitations governs their claims for wrongful death, the event that begins the running of the statute is the decedent's death. The medical malpractice statute of limitations provides that a medical malpractice action must be brought "within two years after the plaintiff or patient discovers, or through the use of reasonable diligence should have discovered the *injury*." Utah Code Ann. § 78–14–4(1) (emphasis added). Shelly's family argues that the "injury" in a wrongful death case arising out of medical malpractice is not the malpractice itself but is, rather, the death. They argue that because there can be no cause of action for wrongful death until death occurs, the statute of limitations on their claims cannot begin to run until Shelly's death.

We have held that an action for wrongful death is an independent action accruing in the heirs of the deceased, *Van Wagoner v. Union Pac. R.R.*, 112 Utah 189, 186 P.2d 293, 303 (1947). This is conceptually compatible with Shelly's family's assertion of a right to proceed independent of any analysis of Shelly's predeath rights against her physicians. However, we have not entirely separated the heirs' right from the decedent's because the heirs' right is in major part based on rights of support, both financial and emotional, that run to them from the deceased. Accordingly, we have held that the wrongful death cause of action is based on the underlying wrong done to the decedent and may only proceed subject to at least some of the defenses that would have been available against the decedent had she lived to maintain her own action. *See, e.g., Kelson v. Salt Lake County*, 784 P.2d 1152, 1155 (Utah 1989) (comparative negligence). The question here is whether we should separate the death from the causative wrong sufficiently to permit a wrongful death action where the decedent's personal injury cause of action had been barred at the time of death. We decline to adopt such a rule.

As one of the foremost authorities on the law of torts has observed, the rationale underlying the rule barring the heirs from bringing a wrongful death suit after the injured patient has brought suit on the underlying personal injury action is that "the injured individual is not merely a conduit for the support of others, he is master of his own claim and he may settle the case or win or lose a judgment on his own injury even though others may be dependent upon him." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 127, at 955 (5th ed. 1984). The majority of states refuses to allow a decedent's heirs to proceed with a wrongful death suit after the decedent has settled his or her personal injury case or won or lost a judgment before dying. *Id.* Given the underlying rationale, and given that the core purpose of any statute of limitations is to compel exercise of a right within a reasonable time to avoid stale claims, loss of evidence, and faded memories, *Horton v. Goldminer's Daughter*, 785 P.2d 1087, 1091 (Utah 1989), we see no reason to impose a different rule regarding the heirs' maintenance of a wrongful death suit where an injured patient has chosen to let the statute of limitations run on the underlying personal injury claim rather than settling or litigating the claim. Therefore, we hold that in wrongful death claims arising out of medical malpractice, the applicable statute of limitations is section 78–14–4 of the Code, and the statute begins to run at the time the "patient discovers or, through the use of reasonable diligence should have discovered the injury, whichever first occurs," meaning the time the patient discovers or should have discovered the medical malpractice injury. Thus, Shelly's family's wrongful death claims are barred by the statute of limitations, unless, as we discuss

below, the statute was tolled for some reason.[3]

Notwithstanding the two-year statute of limitations governing their claims, Shelly's family argues that they are entitled to maintain these actions because the statute of limitations was tolled by Dr. Healy and attorney Healy's fraud sufficiently long that attorney Forgette's notice of intent was timely. Disposition of this claim requires a rather indepth discussion of the complex law of fraudulent concealment.

Fraudulent concealment requires that one with a legal duty or obligation to communicate certain facts remain silent or otherwise act to conceal material facts known to him. 37 Am.Jur.2d *Fraud & Deceit* § 145 (1968). Such a duty or obligation may arise from a relationship of trust between the parties, an inequality of knowledge or power between the parties, or other attendant circumstances indicating reliance. *Id.* The party's silence must amount to fraud, i.e., silence under the circumstances must amount to an affirmation that a state of things exists which does not exist, and the uninformed party must be deprived to the same extent as if a positive assertion had been made. *Id.* Such "[c]oncealment or nondisclosure becomes fraudulent only when there is an existing fact or condition ... which the party charged is under a duty to disclose." *Id.* Making use of a device that misleads, some trick or contrivance that is intended to exclude suspicion and prevent inquiry, may also amount to

fraudulent concealment. *Id.* It is this aspect of fraudulent concealment that is at issue in the instant case.

Applying the facts of Shelly's case to these requirements, Shelly's family's argument must run as follows: (i) Dr. Healy was in a position of superior knowledge and was the beneficiary of Shelly's and her family's trust; (ii) this superior knowledge and position of trust created a duty to disclose material facts regarding Shelly's care; (iii) Dr. Healy knew of his brother's involvement with attorney Sharp and knew of the cursory nature of attorney Sharp's investigation but did not disclose these facts to Shelly's family or, alternatively, concealed them from Shelly's family to divert attention from his alleged malpractice; (iv) Dr. Healy knew that Shelly's family would rely on attorney Sharp's investigation to uncover any malpractice on his part, thus creating a duty on his part to disclose the facts of his association with attorneys Healy and Sharp; (v) in this manner, Dr. Healy used his position of influence with his brother and attorney Sharp to divert Shelly's family's attention away from his care of Shelly, thereby preventing them from discovering the facts constituting the alleged malpractice.

Once this argument is reduced to its basic elements, it is clear that attorney Sharp's investigation cannot be used to start the statute of limitations running against Shelly's claims.[4] What is not as clear is whether Dr.

**3.** Shelly's family also argues that they are entitled to proceed with Shelly's personal injury/medical malpractice claims as her personal representatives and/or heirs under the survival statutes. The survival statutes provide that a deceased person's personal injury action does not abate when that person dies, but rather survives the person's death and may be brought by the deceased's personal representatives or heirs. *See* Utah Code Ann. § 78–11–12. However, if the person has not brought suit before her death, her personal representatives or heirs may bring suit only if the person died before the time allowed for bringing suit had expired, and then they must bring suit within one year of the person's death. *See id.* § 78–12–37.

Absent any reason to toll the statute, the two-year statute of limitations governing Shelly Hipwell's medical malpractice/personal injury claims, section 78–14–4, had run by the time she died. If Shelly did not bring suit before the time

allowed for doing so had expired, her personal injury cause of action did not survive her death, and thus her family cannot bring a survival claim.

**4.** Dr. Healy and McKay–Dee argue that attorney Sharp's investigation of Dr. Healy and McKay–Dee Hospital in early 1989 triggered the statute of limitations as to medical malpractice claims against Dr. Healy and McKay–Dee. We decline to follow this logic on the facts as they are presented to us. While under general principles of agency law, the knowledge of an agent is to be imputed to the principal, it is well established that, where the agent has interests in the transaction adverse to the principal's, or where the agent colludes with third parties whose interests are adverse to the principal's interests, knowledge of the facts at issue will not be imputed to the principal. *See* 3 Am.Jur.2d *Agency* § 290 (1986). In the instant case, attorney Sharp's fee-splitting agreement with attorney Healy and the

Healy's alleged fraudulent concealment was sufficient to continue tolling the statute of limitations once Shelly's family retained attorney Forgette in the fall of 1989. As noted above, Shelly's family contends that they had no facts that could have led them to suspect malpractice by Dr. Healy and McKay–Dee until February of 1990, when they discovered the relationships among Dr. Healy, attorney Healy, Diane DeVries, and attorney Sharp. In contrast, Dr. Healy contends that attorney Forgette considered Dr. Healy and McKay–Dee as potential defendants in a medical malpractice suit on Shelly Hipwell's behalf as early as December 14, 1989, as evidenced by his retainer agreement prepared on that date, which included references to Dr. Healy and McKay–Dee. Shelly's family presented attorney Forgette's affidavit as evidence that he included Dr. Healy and McKay–Dee in his retainer agreement with Shelly's family merely to "cover all the bases" but was retained solely to investigate legal malpractice on the part of attorney Sharp in settling Shelly's claims against University Hospital for her punctured heart.

The trial court made what amounts to a mixed finding of fact and conclusion of law on disputed evidence, to wit, that Forgette's "oral retention of October 19, 1989 clearly demonstrated that Forgette was in possession of facts whereby he *knew or should have known* that [Shelly] Hipwell's condition was caused or possibly caused by negligence on the part of McKay–Dee Hospital and Dr. Healy." (Emphasis added.) This finding and conclusion is inappropriate on a motion for summary judgment. "Summary judgment is appropriate only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *K & T, Inc.*, 888 P.2d at 626–27 (citing Utah R. Civ. P. 56(c); *Higgins*, 855 P.2d at 235). " 'We determine . . . whether the trial court . . . correctly held that there were no disputed issues of material fact.' " *Id.* (quoting *Ferree v. State*, 784 P.2d 149, 151 (Utah 1989)). Here, the trial court erred.

The error committed here directly parallels that made by the trial court in *Berenda v. Langford*, 914 P.2d 45 (Utah 1996). In *Berenda*, we specifically stated:

> The application of this legal rule [of fraudulent concealment] to any particular set of facts is necessarily a matter left to trial courts and finders of fact. . . . [W]e explicitly acknowledge that weighing the reasonableness of the plaintiff's conduct in light of the defendant's steps to conceal the cause of action necessitates the type of factual findings which preclude summary judgment in all but the clearest of cases. Thus, summary judgment is appropriate only when the facts fall on two opposite ends of a factual continuum: either (i) when the facts are so clear that reasonable persons could not disagree about the underlying facts or about the application of the governing legal standard to the facts or (ii) when the facts underlying the allegation of fraudulent concealment are so tenuous, vague, or insufficiently established that they fail to raise a genuine issue of material fact as to concealment, with the result that the claim fails as a matter of law.

*Berenda*, 914 P.2d at 53–54. In that case, we held that the plaintiff's letters to his partner/defendant reflecting the plaintiff's suspicion that the partner was misappropriating partnership assets were insufficient to underlie a trial court finding that the plaintiff was under a duty to make inquiries, which would have led to discovery of the cause of action. *Id.* We found that the letter equally supported the plaintiff's contention that he voiced his suspicions in the letters in an attempt to find out if the company "was really broke." *Id.* We said that "while it may be 'a close call,' . . . we cannot agree that, as a matter of law, the two letters demonstrate that [plaintiff] should have suspected [defendant's] wrongdoing or, more importantly, that an inquiry would reasonably

---

implication in attorney Healy's letter to attorney Sharp that Sharp's investigation of Dr. Healy's care of Shelly was to be minimal indicate that attorney Sharp was, at the least, acting in concert with third parties whose interests were ad-

verse to Shelly Hipwell's. Therefore, his investigation of Dr. Healy and his consideration of Dr. Healy and McKay–Dee as potential defendants in a malpractice action cannot be used to start the statute of limitations running on Shelly's claims.

have led to discovery of the misappropriation." *Id.* at 55.

█ The issue before the trier of fact in this case is whether attorney Forgette discovered or reasonably should have discovered the legal injury done to Shelly Hipwell before December 16, 1989. In other words, the jury must determine whether the facts in this case indicate that Dr. Healy's fraudulent concealment somehow prevented Shelly's family, who, by retaining attorney Forgette, had defeated the collusion of Dr. Healy with his brother and attorney Sharp, from inquiring into the possibility of medical malpractice on the part of Dr. Healy and McKay–Dee. The question becomes: Would a reasonable attorney, presented with the facts that attorney Forgette knew in December of 1989, have considered investigating a medical malpractice case against Dr. Healy and McKay–Dee? This is a genuine issue of material fact, which precludes summary judgment in this case. Therefore, we remand to the trial court on this issue, the outcome of which will determine whether Shelly's family is entitled to proceed on both their survival claims and their wrongful death claims.

Shelly's family's next argument is that even though the statute of limitations bars the adult plaintiffs, Shelly's children were minors at the time of her injury and death and, therefore, section 78–12–36, the tolling statute, came into play and prevented the statute of limitations from running on their claims against Dr. Healy and McKay–Dee.

█ This argument fails because the children's situation does not fit within the tolling statute's terms. Section 78–12–36 provides, "If a person entitled to bring an action ... is at the time the cause of action accrued, [i] either under the age of minority or mentally incompetent and [ii] without a legal guardian, the time of the disability is not a part of the time limited for the commencement of the action." Utah Code Ann. § 78–12–36 (bracketed material added). Shelly's children were not entitled to bring an action for wrongful death because Shelly had an appointed

guardian at the time of her death.[5] The wrongful death statute provides:

> When the death of a person not a minor is caused by the wrongful act or neglect of another, *his heirs,* or his personal representatives for the benefit of his heirs, may maintain an action for damages against the person causing the death.... *If such adult person has a guardian at the time of his death,* only one action can be maintained for the injury to or death of such person, and *such action may be brought by either the personal representatives* of such adult deceased person, for the benefit of his heirs, *or by such guardian* for the benefit of the heirs....

Utah Code Ann. § 78–11–7 (emphasis added). The statute thus clearly provides that if a guardian has been appointed, only the personal representative or guardian may bring suit and the heirs are no longer entitled to maintain an action. In this case, Shayne Hipwell and Sherry Jensen were appointed as Shelly's guardians. Under the statute's plain language, Shelly's children were not entitled to bring an action for her wrongful death, and the tolling statute becomes irrelevant as the children had no claims.

█ As a final argument, Shelly's family seeks to avoid the two-year medical malpractice statute of limitations by bringing their claim within the three-year fraud statute of limitations. During the pendency of the litigation below, Shelly's family amended their complaint to allege common law fraud. Shelly's family argues that the statute of limitations for fraud, section 78–12–26(3), governs these fraud claims, giving them three years from the time they discovered the facts constituting the fraud in which to bring their action. The trial court ruled that section 78–14–4(1)(b), the two-year medical malpractice statute of limitations, governed Shelly's family's claims for fraud. Alternatively, the court held that if the three-year statute applies, Shelly's family had established sufficient issues of material fact to withstand summary judgment on their fraud claims. Shelly's family seeks reversal of the first prong of

---

**5.** A separate question we do not address is whether the tolling statute would have applied to save the children's wrongful death claims even though the statute of limitations had run on Shelly's underlying personal injury claims by the time she died.

this holding, and Dr. Healy and McKay–Dee seek reversal of the second. We uphold the trial court's ruling that the medical malpractice statute of limitations governs Shelly's family's fraud claims, and we need not reach the second ruling.

As stated above, when faced with two statutes that purport to cover the same subject, our primary duty "is to determine legislative intent, and the best evidence of legislative intent is the plain language of the statute." *Sullivan*, 853 P.2d at 879. A settled rule of statutory construction, which helps us determine legislative intent, provides that "a more specific statute governs instead of a more general statute." *De Baritault*, 913 P.2d at 748 (citation omitted). The medical malpractice statute of limitations provides a two-year limit on bringing medical malpractice actions. The statute includes a discovery rule, providing that the two-year limitations period does not begin to run until the "patient discovers, or through the use of reasonable diligence should have discovered the injury, whichever first occurs." Utah Code Ann. § 78–14–4(1). In Utah, the discovery rule includes the judicially created doctrine of fraudulent concealment. *See Berenda*, 914 P.2d at 51. The fraudulent concealment doctrine is a mechanism whereby a plaintiff "can avoid the full operation of the discovery rule by making a prima facie showing of fraudulent concealment and then demonstrating that given the defendant's actions, a reasonable plaintiff would not have discovered the claim earlier." *Id.* The medical malpractice statute of limitations, with its discovery rule and that rule's fraudulent concealment doctrine, applies to every "malpractice action against a health care provider." As noted above, the statute defines "malpractice action against a health care provider" to include actions for wrongful death "based upon alleged personal injuries relating to or arising out of health

care rendered or which should have been rendered by the health care provider." Utah Code Ann. § 78–14–3(14). Thus, the medical malpractice act's two-year statute of limitations applies to cases of fraudulent concealment arising out of medical malpractice.

In contrast, the three-year fraud statute of limitations, section 78–12–26, applies to any action "for relief on the ground of fraud." The fraud statute of limitations is thus far broader than the medical malpractice act, and our rules of statutory construction provide that the more specific medical malpractice act applies instead of the more general fraud statute of limitations.

Shelly's family argues that it has made a general fraud claim and a constructive fraud claim in addition to, and distinct from, their claims of fraudulent concealment discussed above. However, we can find nothing in their allegation of fraud or constructive fraud that is in any way different from their claims of fraudulent concealment. All the allegations raised by Shelly's family surround their claim that Dr. Healy acted to divert the family's attention away from his alleged malpractice when he had a duty to disclose the facts of his relationship with attorneys Healy and Sharp. The only damages arising out of Shelly's family's claims for fraud and constructive fraud relate to the possibility that they were prevented from discovering the facts constituting their claim for medical malpractice. While we acknowledge that there may be cases where a doctor commits fraud on a patient in a way that would not be covered by the medical malpractice act's fraudulent concealment provision, this is not such a case. Given the specific facts alleged in this case, we cannot agree that Shelly's family's fraud claim amounts to anything more than or is different from a claim of fraudulent concealment of medical malpractice.[6] *See Gillman v. Department of Fin.*

6. Shelly's family claims that this reading of the statutes would violate their right to uniform operation of laws under article I, section 24 of the Utah Constitution. They argue that, read as outlined above, the medical malpractice statute creates two classes of people, those defrauded by health care providers and those defrauded by others, and provides a shorter statute of limitations for the former than for the latter. We decline to address this issue as it is inadequately researched and briefed. *See Walker v. U.S. Gen., Inc.*, 916 P.2d 903, 908 (Utah 1996); *Butler, Crockett & Walsh Dev. Corp. v. Pinecrest Pipeline Operating Co.*, 909 P.2d 225, 234 (Utah 1995); *State v. Wareham*, 772 P.2d 960, 966 (Utah 1989); *Graco Fishing & Rental Tools, Inc. v. Ironwood Exploration, Inc.*, 766 P.2d 1074, 1079

*Inst.*, 782 P.2d 506, 509, 511–12 (Utah 1989) (rejecting attempts to recast claim for damages arising out of regulators' licensing decision as claim for negligence to avoid governmental immunity).

In conclusion, we hold that Shelly's family's wrongful death claims are governed by the two-year statute of limitations for medical malpractice actions contained in section 78–14–4 of the Utah Code. We further conclude that the limitations period starts running when the patient or plaintiff discovers, or through the exercise of due diligence should have discovered, the underlying injury and its origins in medical malpractice. We remand this case for a factual finding as to whether Shelly's family's claims of fraudulent concealment will toll the statute of limitations as to their wrongful death and survival claims. We hold that the deceased's children were not entitled to bring a wrongful death claim because their mother had a guardian appointed at the time of her death and thus the children were not entitled to the provisions of the tolling statute. Finally, we hold that Shelly's family's claims for common law fraud are also governed by the two-year medical malpractice statute of limitations found in section 78–14–4 and decline to reach their claims of the unconstitutionality of this reading of the statute.

RUSSON, HOWE, EVES, and HALLIDAY, JJ., concur in Chief Justice ZIMMERMAN's opinion.

Having disqualified themselves, Associate Chief Justice STEWART and Justice DURHAM do not participate herein; District Judge J. PHILLIP EVES and District Judge BRUCE K. HALLIDAY sat.

### On Petition for Rehearing

This court now grants rehearing and issues this opinion without hearing oral argument.

We address whether we should uphold summary judgment in favor of defendant McKay–Dee Hospital ("McKay–Dee") because plaintiffs Shayne Hipwell and Sherry Jensen's wrongful death action against McKay–Dee was barred by the medical malpractice statute of limitations. *See* Utah Code Ann. § 78–14–4. In our prior opinion in this case, we reversed the trial court's grant of summary judgment as to all defendants and remanded on the issue of whether defendant Michael J. Healy's ("Dr. Healy") alleged fraud in collaborating with plaintiffs' original attorney was sufficient to toll the statute of limitations on their medical malpractice claims once they had retained an independent attorney. *Jensen v. IHC Hosps., Inc.*, 944 P.2d 327, 337 (1997). We further held that Jensen and Hipwell's attempt to recharacterize their medical malpractice wrongful death claim as a claim for fraud was not sufficient to avoid the two-year medical malpractice statute of limitations. *Id.* at 337. In its petition for rehearing, McKay–Dee now claims that summary judgment in its favor should have been upheld because (i) Dr. Healy's fraud does not toll the statute of limitations as to Jensen and Hipwell's claims against McKay–Dee; and (ii) Jensen and Hipwell's allegations of fraud on the part of McKay–Dee were properly dismissed by the trial court.

We begin with a brief review of the facts relevant to our decision on rehearing. Because we are reviewing a grant of summary judgment, we view the facts in the light most favorable to the nonmoving parties, Jensen and Hipwell. *Id.* at 328. Jensen and Hipwell allege that Dr. Healy, who had staff privileges at McKay–Dee but was not employed by McKay–Dee, committed malpractice on Shelly Hipwell (Jensen's daughter and Hipwell's wife) while she was a patient at

(Utah 1988); *State v. Amicone*, 689 P.2d 1341, 1344 (Utah 1984).

As we recently noted in *Monson v. Carver*, we may refuse to address a claim of unconstitutionality where the party making the claim has failed to make the requisite showing to support the claim. 928 P.2d 1017, 1024 (Utah 1996). " '[A] reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing

party may dump the burden of argument and research.' " *Id.* (quoting *Butler*, 909 P.2d at 230–31) (additional citations omitted). In this case, as in *Monson*, we are particularly loath to address a claim of unconstitutionality of a statute where the outcome would "critically depend on factual research" into the effectiveness of these differing statutes of limitations in furthering the legislature's purported goals.

McKay–Dee. They claim that, to cover his alleged malpractice, he and a McKay–Dee doctor fraudulently transferred Shelly to University Hospital. Jensen and Hipwell further allege that Dr. Healy then colluded with his brother, attorney Tim Healy, and attorney Roger Sharp to prevent Jensen and Hipwell from learning of the malpractice Dr. Healy had allegedly committed. Jensen and Hipwell made no allegation that McKay–Dee knew about Dr. Healy's collusion with his brother and attorney Sharp.

In our prior opinion, we held that Jensen and Hipwell's allegations of fraud against Dr. Healy were sufficient to toll the statute of limitations on their claims as long as they retained attorney Sharp. *Id.* at 336. However, we remanded to the trial court on the issue of whether Dr. Healy's alleged fraud was sufficient to toll the statute of limitations after Jensen and Hipwell retained independent counsel but before that counsel had actual knowledge of the facts constituting Dr. Healy's alleged fraud. *Id.* at 336–337. The issues we now address are (i) whether Dr. Healy's alleged fraud can also act to toll the statute of limitations as to McKay–Dee; and (ii) whether Jensen and Hipwell's allegations of fraud on the part of McKay–Dee are sufficient to toll the statute of limitations as to McKay–Dee. These issues were not discussed in our initial opinion.

■■■■■ As to the first issue, whether Dr. Healy's fraudulent collusion with Jensen and Hipwell's original attorney can toll the statute of limitations as to McKay–Dee, the general rule is that fraud committed by a third party in concealing a cause of action against another defendant will not toll the statute of limitations as to that defendant. *See* 51 A. Jur. 2d *Limitation of Actions* § 150 (1970). Where, however, there is an agency or privi-

ty relationship between the third party committing the fraud and the defendant, our cases indicate that liability for the agent's negligent or intentional tort can be imputed to the principal if the agent acts in whole or in part to carry out the purposes of the principal. *See Hodges v. Gibson Prods. Co.*, 811 P.2d 151, 156 (Utah 1991); *Birkner v. Salt Lake County*, 771 P.2d 1053, 1057 (Utah 1989).[1] On the record before us, we cannot determine whether Dr. Healy's fraud in colluding with attorney Sharp and attorney Healy should be imputed to McKay–Dee absent two factual findings: (i) that Dr. Healy was McKay–Dee's agent; and (ii) that Dr. Healy acted in whole or in part to further the aims of McKay–Dee. The complaint makes no allegations regarding these issues. We remand to the trial court for further proceedings.

If the trial court finds that Dr. Healy was McKay–Dee's agent and that he acted at least in part to further McKay–Dee's aims, it should impute liability for Dr. Healy's fraud to McKay–Dee and toll the statute of limitations as to McKay–Dee to the same extent it is tolled as to Dr. Healy.[2] If, on the other hand, the trial court finds either that Dr. Healy was not McKay–Dee's agent or that Dr. Healy acted "entirely on personal motives unrelated to [McKay–Dee's] interests," *Hodges*, 811 P.2d at 157, then Dr. Healy's fraud does not toll the statute of limitations as to McKay–Dee and Jensen and Hipwell's claims against McKay–Dee are barred.

Moving to the second issue raised on rehearing, Jensen and Hipwell argue that the statute of limitations as to McKay–Dee should be tolled because of fraud allegedly committed by McKay–Dee, through one of its doctors, in participating in an allegedly fraudulent transfer of Shelly Hipwell from McKay–Dee to University Hospital. Jensen

---

1. The cases cited also include two other factors to consider in determining whether an agent's conduct will be imputed to the principal in the employment context: (i) whether the employee's conduct is of the general kind the employee is expected to perform; and (ii) whether the employee's conduct occurred within the hours of the employee's work and ordinary spatial boundaries. *Hodges*, 811 P.2d at 156; *Birkner*, 771 P.2d at 1056–57. As Dr. Healy was not McKay–Dee's employee, these criteria would not seem to

apply to the question of whether Dr. Healy's acts fall within the scope of any agency relationship he may have had with McKay–Dee.

2. We note, however, that this issue will be moot if the fact finder determines, pursuant to our prior opinion, that Jensen and Hipwell's complaint was not timely filed because Dr. Healy's fraud did not toll the statute of limitations long enough. *See Jensen*, 944 P.2d at 337.

and Hipwell did not originally argue that McKay–Dee had committed fraud that would toll the statute of limitations. Their complaint did, however, include a count of constructive fraud against McKay–Dee. The trial court held first that the medical malpractice statute of limitations, section 78–14–4 of the Code, barred Jensen and Hipwell's claim of constructive fraud against McKay–Dee. In the alternative, the trial court ruled that the claim was "unsupported by the facts" and that there was "insufficient evidence to submit this matter to a jury as the fact finder." In our original opinion, we upheld the trial court's finding that Jensen and Hipwell's claim for constructive fraud amounted to nothing more than a claim for medical malpractice, which would be barred by the medical malpractice statute of limitations. *Jensen,* at 337. We did not address, however, the contention that Jensen and Hipwell's allegations of constructive fraud on the part of McKay–Dee would be sufficient to toll the statute of limitations on Jensen and Hipwell's medical malpractice claims against McKay–Dee. We find that the trial court properly granted summary judgment to McKay–Dee, ruling that Jensen and Hipwell's constructive fraud claim was insufficiency supported by the evidence and therefore could not be used to toll the statute of limitations.

Addressing the merits of this claim requires a careful analysis of the relative burdens of proof and production involved in making and opposing a motion for summary judgment. As noted above, when reviewing a motion for summary judgment, we view all facts in the light most favorable to the nonmoving party. *Id.* at 328. On a motion for summary judgment, the moving party bears the burden of proof for its motion, namely, the burden of proving that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. However, in opposing a motion for summary judgment, the plaintiff still has the ultimate burden of proving all the elements of his or her cause of action. *Thayne v. Beneficial Utah, Inc.,* 874 P.2d 120, 124 (Utah 1994). Further, once challenged, the party who opposed such a motion must come forward with sufficient proof to

support his or her claim, particularly when that party has had an opportunity to conduct discovery. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his [or her] pleading, but his [or her] response, by affidavits or as otherwise provided in this rule, *must set forth specific facts showing that there is a genuine issue for trial.*" Utah R. Civ. P. 56(e) (emphasis added). Put another way, once the moving party has brought forth evidence either tending to prove a lack of genuine issue of material fact or challenging the existence of one of the elements of the cause of action, the nonmoving party then bears the burden of "provid[ing] some evidence, by affidavit or otherwise, in support of the essential elements of his [or her] claim." *Thayne,* 874 P.2d at 124.

■■■■ In this case, Jensen and Hipwell failed to provide any such evidence to support their claim of constructive fraud. Constructive fraud requires two elements: (i) a confidential relationship between the parties; and (ii) a failure to disclose material facts. *See Blodgett·v. Martsch,* 590 P.2d 298, 301–02 (Utah 1978); 37 Am. Jur. 2d *Fraud and Deceit* §§ 4, 15 (1968). Jensen and Hipwell's complaint alleges both (i) that McKay–Dee's employee, Dr. Baughman, had a confidential relationship with Shelly and her family as one of her treating physicians, and (ii) that Dr. Baughman failed to disclose that he had committed medical malpractice in treating Shelly. McKay–Dee's motion for summary judgment did not challenge Jensen and Hipwell's assertion that Dr. Baughman had a confidential relationship with Shelly and her family. McKay–Dee's motion, however, did dispute Jensen and Hipwell's allegation that Dr. Baughman failed to disclose his alleged malpractice. McKay–Dee produced the deposition of Dr. Baughman, wherein he states, "I have no question at all that [Shelly] received care that's exemplary, that could be used as an example of the management of a good operation." Dr. Baughman further indicated that he held that belief at the time he provided Shelly's care. McKay–Dee properly challenged Jensen and Hipwell's allegation that Dr. Baughman had failed to discharge

his duty to disclose material facts to them, namely, the fact that he had committed malpractice, by producing Dr. Baughman's deposition in which he states that he did not believe and does not believe that he committed malpractice.

Jensen and Hipwell, however, as the nonmoving parties, utterly failed to meet their burden of coming forward with evidence to contradict Dr. Baughman's deposition testimony. In their opposition to McKay–Dee's motion for summary judgment, Jensen and Hipwell simply reiterate the allegations of their complaint and provide no support for their claim that Dr. Baughman failed to tell them that Shelly had been "left to bleed internally for several hours before accurately diagnosing her illness." Dr. Baughman's deposition testimony specifically and directly challenges Jensen and Hipwell's assertion, and they failed to provide any evidence to support their claim. Thus, the trial court correctly ruled that there was insufficient evidence to submit the matter to a jury. Because Jensen and Hipwell's claim of constructive fraud against McKay–Dee was insufficiently supported by the evidence, such a claim cannot be used to toll the statute of limitations on their medical malpractice claims against McKay–Dee.

We remand to the trial court for further proceedings consistent with this opinion.